**SPOKANE INDIAN TRIBE,**
**Plaintiff–Appellant,**

v.

**UNITED STATES of America,**
**Defendant–Appellee.**

No. 91–35454.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 7, 1992.

Decided Aug. 12, 1992.

Scott D. Crowell, Fife, Washington, and Robert J. Roberts, Dellwo, Roberts & Scanlon, Spokane, Wash., for plaintiff-appellant.

Albert M. Ferlo, Jr., and Peter A. Appel, U.S. Dept. of Justice, Wash., D.C., for defendant-appellee.

Before: ALARCON, RYMER, and T.G. NELSON, Circuit Judges.

ALARCON, Circuit Judge:

The Spokane Tribe of Indians (the Tribe) appeals from a grant of summary judgment in favor of the United States (the Government). The district court determined that Pick Six Lotto (Pick Six) was not a Class II gaming device as defined by the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.* We affirm. Pick Six is excluded from the definition of Class II gaming devices because it is an electronic facsimile of a game of chance. Furthermore, the legislative history of the IGRA demonstrates that Congress did not intend to include lotteries when it used the term "lotto" in the definition of Class II gaming devices.

## FACTS AND PROCEDURAL HISTORY

The Tribe operates a gaming casino on tribal land in Eastern Washington. In 1989, the Tribe introduced Pick Six gaming devices in the casino. Pick Six is played by placing money into the Pick Six terminal. A video screen at a Pick Six terminal displays one or more electronic tickets. The player selects six numbers ranging from "1" to "45." The computer then selects its own six numbers. If two or more of the numbers selected by the player match those selected by the computer, the player will receive credits to play additional games. A player who matches all six numbers wins a significant number of credits, depending on the level of the jackpot. At the end of the game, the credits accumulated by the player may be converted to cash.

The Pick Six terminals are electronically linked together so that they share a jackpot. A portion of the amount of money that an individual places in the Pick Six game is added to the joint jackpot.

Pursuant to the requirements of the IGRA, the Tribe began negotiations with the State of Washington to enter into a tribal-state compact in late 1989. The negotiations broke down in February of 1990 when the State insisted that Pick Six was included in the games classified as Class III gaming devices.

The dispute was submitted to the United States Attorney's Office for the Eastern District of Washington. On August 22, 1990, the United States Attorney's Office notified the Tribe that Pick Six was not a Class II gaming device and that operation of the devices absent a compact with the State violated the law. Tribal representatives met with the United States Attorney's office in an unsuccessful attempt to resolve the Pick Six issue. The Tribe and the Government ultimately agreed to resolve the issue by an action under the Declaratory Judgment Act. 28 U.S.C. § 2201 *et seq.* The parties filed cross-motions for summary judgment. The district court declared that Pick 6 was not a Class II gaming device.

## I.

## JURISDICTION

The Government has not challenged our jurisdiction to review this matter. Nevertheless, we must determine whether we have jurisdiction over this action for a declaratory judgment *sua sponte. Matter of Pizza of Hawaii, Inc.,* 761 F.2d 1374, 1377 (9th Cir.1985). Under the Declaratory Judgment Act, a federal court may "declare the rights and other legal relations" of parties to a "case of actual controversy." 28 U.S.C. § 2201. The purpose of the Declaratory Judgment Act is "to relieve

potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure—or never." *Hal Roach Studios, Inc. v. Richard Feiner and Co.*, 896 F.2d 1542, 1555 (9th Cir.1990) (quoting *Societe de Conditionnement v. Hunter Engineering Co.*, 655 F.2d 938, 943 (9th Cir.1981).

In *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941), the Supreme Court ruled that "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment." *Id.* at 273, 61 S.Ct. at 512. If the defendant's actions cause the plaintiff to have a "real and reasonable apprehension that he will be subject to liability," the plaintiff has presented a justiciable case or controversy. *Hal Roach*, 896 F.2d at 1555.

██ This matter presents a justiciable controversy. In the August 22, 1990 letter from the United States Attorney's Office, the Government informed the Tribe that it had "concluded that the 'Pick 6' lotto is being operated in violation of state and federal law." It also stated that state law provided for "the immediate seizure of the machines without court orders and their confiscation and destruction by order of the court." The Government requested the Tribe to "discontinue operation of 'Pick 6' lotto as soon as is practical and refrain from operating 'Pick 6' lotto or other electronic gambling devices unless and until there is a Tribal–State compact that has been approved by the Secretary of the Interior." Because of the reference to the violation of state and federal law and the power to confiscate and destroy the gaming devices, the Tribe had a reasonable apprehension that it would be subject to litigation and loss of its property if it continued to operate the Pick Six games. As set forth above, the Tribe and the State of Washington disagreed on the question of whether Pick Six was a Class II gaming

device. The failure of the parties to conclude a tribal-state compact because they disagreed over the classification of the Pick Six game fully demonstrates that there is an actual controversy. *See Oneida Tribe of Indians v. State of Wisconsin*, 951 F.2d 757, 760 (7th Cir.1991) (holding that where the negotiations of a tribal-state compact were at an impasse because of a disagreement over the term "lotto," an actual controversy existed for the purposes of the Declaratory Judgment Act).

## II.

### CLASSIFICATION OF PICK SIX UNDER THE IGRA

The Tribe contends that the district court erroneously determined that Pick Six was a Class III gaming device. The Tribe argues that Pick Six is a Class II gaming device and should be exempt from the requirement of a tribal-state compact. We review a grant of summary judgment *de novo*. *Ernzen v. United States*, 922 F.2d 1433, 1435 (9th Cir.1991). We also apply *de novo* review to the interpretation of a statute. *United States v. $47,980.00 in Canadian Currency*, 804 F.2d 1085, 1089–90 (9th Cir. 1986), *cert. denied*, 481 U.S. 1072, 107 S.Ct. 2469, 95 L.Ed.2d 878 (1987).

Under the IGRA, Class I gaming includes social games of minimal value or traditional forms of Indian gaming. 25 U.S.C. § 2703(6). The IGRA defines Class II gaming, in relevant part, as follows:

(i) the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith)—

(I) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations,

(II) in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and

(III) in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards,

including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo ...

25 U.S.C. § 2703(7)(A).

The definition of Class II gaming specifically excludes any "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." 25 U.S.C. § 2703(7)(B)(ii).

Class III gaming includes all forms of gaming not covered by Class I or Class II gaming. 25 U.S.C. § 2703(8). In order to engage in Class III gaming, the Indian tribe must enter into a compact with the State government in which the Indian reservation is located. 25 U.S.C. § 2710(d)(1)(C).

■ The Pick Six game operated by the Tribe is not a Class II gaming device because Class II gaming excludes any "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." 25 U.S.C. § 2703(7)(B)(ii). The Senate Report distinguished this prohibition from the provision allowing "electronic, computer, or other technologic aids" to be used in conjunction with bingo:

> The Committee intends that tribes be given the opportunity to take advantage of modern methods of conducting class II games and the language regarding technology is designed to provide maximum flexibility. In this regard, the Committee recognizes that tribes may wish to join with other tribes to coordinate their class II operations and thereby enhance the potential of increasing revenues ... Simultaneous games participation between and among reservations can be made practical by use of computers and telecommunications technology as long as the use of such technology does not change the fundamental characteristics of the bingo or lotto games ... In other words, such technology would merely broaden the potential participation levels and is readily distinguishable from the use of electronic facsimiles in which a single participant plays a game with or against a machine rather than with or against other players.

S.Rep. No. 446, 100th Cong., 2d. Sess. 9 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3079.

The Pick Six game is not merely an electronic aid to enhance the participation of more than one person in the Tribe's Class II gaming activities. In Pick Six, a single player picks six numbers and tries to match them against numbers picked by a computer. The player can participate in the game whether or not anyone else is playing at the same time. Rather than broadening potential participation in a bingo-like game, Pick Six is an electronic facsimile in which a single participant plays against the machine. Accordingly, it cannot be classified as a Class II gaming device.

■ The Tribe argues that although Pick Six is a lottery, it should be regulated as a Class II gaming device. In order to place Pick Six within the definition of a Class II gaming device, the Tribe urges us to conclude that the plain meaning of the term "lotto" is lottery.

In construing a statute, we must first examine the plain meaning of the words used by Congress. *Pyramid Lake Paiute Tribe v. United States Dept. of Navy*, 898 F.2d 1410, 1417 (9th Cir.1990). We must assume that the "legislative purpose is expressed by the ordinary meaning of the words used." *Seldovia Native Ass'n, Inc. v. Lugan*, 904 F.2d 1335, 1341 (9th Cir. 1990).

In *Oneida Tribe*, 951 F.2d 757, the Oneida tribe also contended that the term "lotto" as used in the IGRA refers to lottery type games of chance. *Id.* at 758. The Seventh Circuit rejected the Oneida tribe's argument. *Id.* at 760–62. In ruling that the term "lotto" does not come within the definition of "lottery," the court held that "lotto" unambiguously means "a game of chance, played in a bingo-like setting on a bingo-like card, following bingo-like procedures." *Id.* at 761. "[D]efining 'lotto' as 'a bingo-like game' is not at odds with but, rather, is harmonious with the tenor and intent of [25 U.S.C. § 2703(7)(A)]." *Id.* at 763. The court noted that its conclusion that "lotto" meant a bingo-like game was

also supported by the congressional findings and declaration of policy set forth in the IGRA. *Id.*

While we agree with the result reached by the Seventh Circuit in *Oneida Tribe,* we have concluded that the meaning of the word "lotto" is not clear from the face of the statute. Accordingly, we must look to the legislative history of the IGRA. The primary definition of "lotto" is consistent with that set forth in *Oneida Tribe.* Lotto is described as a game played with "cards bearing rows of numbers in which a caller draws numbered counters from a stock and each player covers the corresponding numbers if they appear on his card, the winner being the one who first covers one complete row." Webster's Third International Dictionary 1338 (4th ed. unabridged 1976). The Tribe, however, points out that "lotto" has a secondary meaning: "A lottery, as one operated by a state government, in which players choose numbers that are matched against those of the official drawing, the winning numbers typically paying large cash prizes." The Random House Dictionary of the English Language 1138 (2d ed. unabridged 1987).

These differing definitions of lotto render the meaning ascribed to the word by Congress ambiguous. Although statutory ambiguities in legislation enacted for the benefit of Indians should be resolved in their favor, this presumption "does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." *South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 506, 106 S.Ct. 2039, 2044, 90 L.Ed.2d 490 (1986). If the statutory language gives rise to several interpretations, we must adopt the one which can "most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." *In re Arizona Appetito's Stores, Inc.,* 893 F.2d 216, 219 (9th Cir.1990) (quoting *United States v. 594, 464 Pounds of Salmon,* 871 F.2d 824, 827 (9th Cir.1989).

The Tribe asserts that the statements of Senator Domenici and Senator Burdick demonstrate that Congress understood the term "lotto" to include "lottery." Accordingly, the Tribe asserts that Pick Six is a lottery which does not come within state regulation as a Class III gaming device. The Tribe's contention finds no support in the legislative history. On September 15, 1988, the proposed IGRA was amended. The new language allowed pull tabs, lotto, punchboards, tip jars, instant bingo and other games similar to bingo to be classified as Class II games only if they were played at the same location. Senator Domenici made the following comment:

> Mr. Chairman, I want to thank you for including an amendment to clarify that lotto games are played only at the same location as bingo games which are class II games under the bill. *I believe there are other Senators who have questioned whether lotto and lotteries are interchangeable terms. This amendment makes it clear that they are not* and that traditional type lottery games are indeed class III. As such, lotteries may only be conducted by a tribe if such games are otherwise legal in the State and if the tribe and the State have reached a compact to regulate such games.

134 Cong.Rec. 12650 (1988) (emphasis added).

Senator Dominici's comments demonstrate that the September 15, 1988 amendment was enacted to clarify that "lotto" was not synonymous with "lottery."

Later in the proceedings, Senator Burdick noted his pleasure that "the issue of whether tribes can operate statewide lotteries without a tribal/state compact has been resolved in the committee amendments." *Id.* at 12655. Senator Burdick read a letter from the Attorney General for North Dakota who was concerned that the proposed legislation would "permit a tribally operated lottery." *Id.* Senator Burdick presumably believed that the amendment adopted on September 15, 1988 resolved the concern expressed in the letter sent by the Attorney General for North Dakota. Senator Burdick's comments support our conclusion that the September 15, 1988 amendment

was designed to clarify that Indian tribes could not operate a statewide lottery without a tribal-state compact. The legislative history of the IGRA demonstrates that Congress did not intend lotteries and number games like Pick Six to be considered Class II gaming devices.

AFFIRMED.