223 F.3d 1091 (9th Cir. 2000)
 UNITED STATES OF AMERICA, Plaintiff-Appellant,
v.
103 ELECTRONIC GAMBLING DEVICES, Located at the Red Fox Casino, Laytonville Rancheria, Mendocino County, California, Defendant, CAHTO TRIBE, SHODAKI COYOTEVALLEY CASINO; GENEVIEVE CAMPBELL; SHARP IMAGE GAMING, INC., Claimants, MULTIMEDIA GAMES, INC., Claimant-Appellee.
Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted June 14, 2000--San Francisco, California
Filed August 29, 2000
 
 [Copyrighted Material Omitted]
 Stephen C. Lewis, Catherine J. Depew, Special Assistant United States Attorneys, Tulsa, Oklahoma; Sean Connelly, Attorney, United States Department of Justice, Denver, Colorado, for the plaintiff-appellant.
 Layn R. Phillips, Gregory R. Smith, Theodore H. Frank, Irell & Manella, Los Angeles, California, for the claimant-appellee.
 Appeal from the United States District Court for the Northern District of California, D.C. No. CV-98-1984-CW; Charles R. Breyer, District Judge, Presiding
 Before: Andrew J. Kleinfeld, A. Wallace Tashima and Marsha S. Berzon, Circuit Judges.
 BERZON, Circuit Judge:
 
 
 1
 This case poses the question, what is bingo? Cf. Frigaliment Importing Co. v. B.N.S. Int'l Sales Corp., 190 F. Supp. 116, 117 (S.D.N.Y. 1960) (Friendly, J., sitting by designation) ("The issue is, what is chicken?"). In particular, we determine whether an electronic game called MegaMania, manufactured and sold by Appellee Multimedia Games, Inc. ("Multimedia"), is "bingo" as that term is defined in the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. SS 27012721.
 
 
 2
 Appellant the United States thinks not. The Government claims that the terminals on which MegaMania is played are "gambling devices" within the meaning of the Johnson Act, 15 U.S.C. SS 1171-1178. The Johnson Act prohibits the possession and operation of any "gambling device", as defined in the Act, id. S 1171(a), on Indian land, see id. S 1175(a), unless authorized by a tribal-state compact, see 25 U.S.C. S 2710(d)(6). Invoking the Johnson Act, the Government brought this forfeiture action against, inter alia, some twenty odd Mega Mania game terminals located at the Red Fox Casino, an Indian gaming facility in Northern California.
 
 
 3
 Under IGRA, however, bingo and electronic aids thereto are generally permissible in Indian country. See id. SS 2703(7)(A), 2710. Multimedia asserts that MegaMania is a bingo game, and that the use of the games at the casino was therefore legal.
 
 I. The Game
 
 4
 In MegaMania, players compete against each other in a single, interlinked electronic game via a network of individual computer terminals located at tribal gaming facilities throughout the country. At their respective terminals, players may make an initial purchase at 25 cents per card of up to four electronic game "cards," displayed on the video screens of each terminal.[1] A participant may play up to four cards at a time.
 
 
 5
 MegaMania does not commence until at least twelve people begin playing a minimum of 48 cards collectively. Once the game begins the players start receiving a series of threenumber draws displayed on-screen and announced through audio channels.[2] For each three-number draw a player must pay 25 cents per card that he or she is playing (e.g., if a player has three cards on her screen, she must pay 75 centsper draw).[3] This pay-per-draw style of play is called "ante up" bingo. After a set of numbers is drawn players must press a "Daub Cards" button ("daub button") to "cover " the called numbers on the cards. When a player presses the daub button, the computer automatically covers corresponding numbers on the player's cards. After each three-number draw is displayed a player has eight seconds to decide whether to continue playing the card(s) for another draw.
 
 
 6
 When a player covers a straight line either horizontally, vertically or diagonally and declares "bingo" (by pressing the daub button) on one or more cards, every player in every facility nationwide is notified of the bingo. Once a player (or players) get(s) bingo, this straight-line game ends. Each player with bingo wins a monetary prize, the amount of which is based on the total number of cards being played in the game, the number of balls drawn since the game began, and the number of players reaching bingo simultaneously. The top jackpot on the straight-line game is $5000, awarded for a bingo achieved after the first four numbers are drawn, the earliest point at which a player can get bingo.
 
 
 7
 In addition to the traditional straight-line game, there is a "corners game" (dubbed "CornerMania"). In the corners game, each player who covers two, three, or four corners of a card gets a prize. The corners game is played continuously until the straight-line game ends, so there can be one or more CornerMania winners on each draw after the first. If no corners game prize has been awarded before the straight-line game ends, additional numbers are drawn three at a time until at least one corner prize is given out.
 
 II. IGRA and its Implementing Regulations
 
 8
 In 1988, Congress adopted IGRA to provide "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. S 2702(1). IGRA places games played on Indian land into three classes: class I consists of traditional Indian games or social games played for prizes of minimal value; class II includes bingo and games similar to bingo, plus certain card games; class III is comprised of all games not in classes I or II. See id. SS 2703(6)-(8). Only if a tribe has negotiated a tribal-state compact may it run class III games on its land. See id. at S 2710(d)(1)(C). At the time the Government brought this forfeiture action, no such compact was in place between the Cahto Tribe and the State of California. Thus, for our purposes the critical question is whether MegaMania and the MegaMania terminals are class II gaming under IGRA.
 
 
 9
 IGRA defines class II gaming in relevant part as follows:
 
 
 10
 (i) the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith)--
 
 
 11
 (I) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations,
 
 
 12
 (II) in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and
 
 
 13
 (III) in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards, including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo, . . . .
 
 
 14
 Id. S 2703(7)(A). IGRA, however, explicitly excludes from Class II gaming "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind. " Id. S 2703(7)(B)(ii).
 
 
 15
 As part of its initiative to deal with tribal gaming, Congress created the National Indian Gaming Commission ("NIGC") to regulate tribal gaming. The NIGC's broad powers include inspecting tribes' books and records, approving tribal-state pacts, levying and collecting civil fines, monitoring and even shutting down games, and promulgating regulations and guidelines it deems appropriate to implement IGRA. See 25 U.S.C. SS 2705-06, 2713.
 
 
 16
 The NIGC has developed regulations to refine the scope of class II gaming. One such regulation, 25 C.F.R.S 502.3, set out in the margin, for the most part adopts the language of S 2703(7)(A).[4] Another defines "a game similar to bingo" as "any game that meets the requirements for bingo under [25 C.F.R. S 502.3(a)] and that is not a house banking game under [25 C.F.R. S 502.11]." 25 C.F.R.S 502.9. A "house banking game" is "any game of chance that is played with the house as a participant in the game, where the house takes on all players, collects from all losers, and pays all winners, and the house can win." 25 C.F.R. S 502.11.
 
 III. Procedural History
 
 17
 The Government filed two in rem civil forfeiture actions: one in the Northern District of Oklahoma, and five months later, this one.
 
 
 18
 The Government filed this in rem action in May of 1998, proceeding against 103 electronic game machines located at the Red Fox Casino, Laytonville Rancheria, Mendocino County, California, including 20 MegaMania machines. The Government's complaint alleged that the games were subject to forfeiture as illegal gambling devices under the Johnson Act. Multimedia, inter alia, filed a claim and answer for the MegaMania machines. Shortly thereafter, the Government and Multimedia each filed motions for summary judgment. The district court granted Multimedia's motion, concluding that the MegaMania terminal is not a gambling device under the Johnson Act, but, instead, is a class II technologic aid to the game of bingo under IGRA. See United States v. 103 Elec. Gambling Devices, No. C 98-1984 CRB, 1998 WL 827586, at *8, *10 (N.D. Cal. Nov. 23, 1998) ["103 Elec. Gambling Devices I"].
 
 
 19
 We now consider the Government's appeal. Reviewing the district court's interpretation of IGRA and its grant of summary judgment de novo, see Alexander v. Glickman, 139 F.3d 733, 735 (9th Cir. 1998); Balint v. Carson City , 180 F.3d 1047, 1050 (1999), and viewing the evidence in the light most favorable to the Government, see Balint, 180 F.3d at 1050,[5] we conclude, in agreement with the district court, that under IGRA, MegaMania is a legal class II bingo game, and that the MegaMania terminal is a legal class II electronic aid to bingo.
 
 
 20
 IV. The Game of Chance Commonly Known as Bingo
 
 A. Bingo in the Abstract
 
 21
 Before considering whether MegaMania satisfies the three criteria for aclass II bingo game set forth in 25 U.S.C. S 2703(7)(A)(i)(I)-(III), we turn to the Government's argument that these three factors are not the only criteria a game must meet to be an IGRA class II bingo game: The Government maintains that because IGRA uses the phrase`the game of chance commonly known as bingo' before spelling out the three criteria, other features that have traditionally characterized bingo games are also pertinent in determining whether or not a game is a class II bingo game. The Government contends, specifically, that (i) traditional bingo games lack the ante-up feature MegaMania possesses, (ii) in a traditional bingo game, unlike CornerMania, earnings depend on those of other players, and (iii) MegaMania's "manic pace " and potentially high stakes are markedly different than the placid tranquility and token rewards and losses associated with a traditional bingo game, see Appellant's Opening Brief ("AOB") at 23 (citing Alice Andrews, Hooked on Bingo 11 (1988) ("There is a calm and peacefulness in playing Bingo. There is a get-away-from-it-all feeling, kind of like bamboo fishing.")).
 
 
 22
 The Government's efforts to capture more completely the Platonic "essence" of traditional bingo are not helpful. Whatever a nostalgic inquiry into the vital characteristics of the game as it was played in our childhoods or home towns might discover, IGRA's three explicit criteria, we hold, constitute the sole legal requirements for a game to count as class II bingo.
 
 
 23
 There would have been no point to Congress's putting the three very specific factors in the statute if there were also other, implicit criteria. The three included in the statute are in no way arcane if one knows anything about bingo, so why would Congress have included them if they were not meant to be exclusive?
 
 
 24
 Further, IGRA includes within its definition of bingo "pulltabs, . . . punch boards, tip jars, [and] instant bingo . . . [if played in the same location as the game commonly known as bingo]," 25 U.S.C. S 2703(7)(A)(i), none of which are similar to the traditional numbered ball, multi-player, card-based game we played as children. Cf. Merriam-Webster's Collegiate Dictionary 114 (10th ed. 1999) (defining bingo as "a game of chance played with cards having numbered squares corresponding with numbered balls drawn at random and won by covering five such squares in a row"). Instant bingo, for example, is as the Fifth Circuit explained in Julius M. Israel Lodge of B'nai Brith No. 2113 v. Commissioner, 98 F.3d 190 (5th Cir. 1996), a completely different creature from the classic straight-line game. Instead, instant bingo is a selfcontained instant-win game that does not depend at all on balls drawn or numbers called by an external source. See id. at 192-93.
 
 
 25
 Moreover, S 2703(7)(A)(i)'s definition of class II bingo includes "other games similar to bingo," 25 U.S.C. S 2703(7)(A)(i), explicitly precluding any reliance on the exact attributes of the children's pastime.
 
 
 26
 Finally, and critically, the NIGC's interpretation of both IGRA and the NIGC's primary IGRA implementing regulation, 25 C.F.R. S 502, rests on the proposition that neither Congress nor the Commission intended to "limit bingo to its classic form." Action for Final Rule 25 C.F.R.S 502 ("S 502 Action"), 57 Fed. Reg. 12382, 12382. A fuller version of the Commission's interpretation is set out in the margin.[6] The NIGC's conception ofwhat counts as bingo under IGRA, as articulated in the agency's Final Action on S 502 a few years after IGRA was enacted, is entitled to substantial deference, for "[administrative] practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work as efficiently and smoothly while they are yet untried and new." Norwegian Nitrogen Co. v. United States, 288 U.S. 294, 315 (1933) (Cardozo, J.).
 
 
 27
 We briefly address one of the Government's specific extratextual arguments as to why MegaMania is not class II bingo. The Government contends that the "ante-up" feature of MegaMania "distinguishes [it] from the game commonly known as bingo, as historically played throughout this country and indeed even today in tribal bingo facilities," AOB at 18-19, observing that in a traditional (presumably church-hall style) bingo game, players pay a fixed price for a "session pack" of cards, which lets them play for an evening. But the Government invokes nothing other than tradition to explain precisely why the ante-up pricing method is proscribed by IGRA. As the district court noted, "there is nothing in the statute or the regulations that requires a player to pay one price up front to play the entire game." 103 Elec. Gambling Devices I, 1998 WL 827586, at *7. Given Congress's and the NIGC's apparent intentions not to supplement IGRA's bingo specifications, we reject the Government's challenge to the ante-up feature.
 
 
 28
 All told, S 2703(7)(A)(i)'s definition of "the game of chance commonly known as bingo" is broader than the Government would have us read it. We decline the invitation to impose restrictions on its meaning besides those Congress explicitly set forth in the statute. Class II bingo under IGRA is not limited to the game we played as children.
 
 
 29
 B. "The Game is Won by the First Person"
 
 
 30
 As stated, IGRA defines bingo as, inter alia, a game "(III) in which the game is won by the first person covering a previously designated arrangement of numbers . . . on such cards." 25 U.S.C. S 2703(7)(A)(i); see also 25 C.F.R. S 502.3. The Government contends the "continuous-win" feature (or "interim win", as Multimedia puts it) of CornerMania does not comply with IGRA's third requirement,[7] because (i) CornerMania can result in multiple payouts before the straight-line game ends; and (ii) each CornerMania payout does not depend on the number of other players receiving CornerMania prize money but rather on the number of corners covered on each draw and on the number of balls drawn since the game began. For these two reasons, maintains the Government, MegaMania is not "won by the first person covering a previously designated arrangement of numbers or designations on such cards," 25 U.S.C. S 2703(7)(A)(i)(III).[8]
 
 
 31
 The question before us, though, is whether MegaMania, not one of its constituent components, satisfies IGRA's statutory criteria for class II gaming. Thus, MegaMania as a whole is "the game" to which S 2703(7)(A)(i)(III) pertains.
 
 
 32
 Turning to the question of whether MegaMania satisfies S 2703(7)(A)(i)(III), as an initial matter, there is no reason that the "previously designated arrangement" to which the statute refers must be a straight line. Indeed, the statutory description just quoted quite clearly permits any pattern to yield a prize, as long as the pattern is "previously designated". Moreover, even if we were to resort for this purpose to the inquiry into "essential" bingo we have already rejected, we would not rule otherwise. As an affidavit submitted to the district court by an FBI racketeering investigator attests, "[i]n the game commonly known as bingo . . . . [e]xamples of predesignated winning patterns include the traditional straight line, four corners, letters X or L, or covering the full card."
 
 
 33
 As for the ultimate question of whether MegaMania is "won" by the first person covering a previously designated arrangement, assuming that in a given game of MegaMania players win several rounds of CornerMania before the straight-line game ends, it would appear that each such player has "won" by "covering a previously designated arrangement." The first focus of this issue is nothing less than the meaning of the word "win": Can someone "win " a game even though the other players may also "win"? That is, does "win" necessarily mean "beat"?
 
 
 34
 The answer, according to Webster's II New College Dictionary, is that "win" can mean "beat" but need not: That dictionary's first definition of "win" is " `[t]o achieve victory over others in a competition or contest,' " Webster's II New College Dictionary 1264 (1995), while the second is" `[t]o receive [money] as a prize or a reward for performance.' " Id.; see also 20 Oxford English Dictionary 361 (2d ed. 1989) (giving as one definition, "[t]o gain by effort or competition, as a prize or reward, or in gaming or betting, as a wager, etc."). So, for example, in an instant lottery game, everyone whose scratch card entitles them to ten dollars "wins " a prize, with no effect on how many others may win or in what amount.
 
 
 35
 Because "winning" does not necessarily entail vanquishing one's opponents, the meaning of "win" in the statute is at worst ambiguous. In light of that ambiguity, we look for indications that Congress intended to preclude the award of multiple prizes in a single game of bingo.
 
 
 36
 The record in this case establishes that, in addition to the usual straight-line prize, some traditional live bingo games also make interim payouts to players who cover the corners of their cards; we presume those players believe that they have "won" prizes, even though the game has not ended and others may "win" as much or more. Additionally, as already stated, IGRA explicitly designates instant bingo as a class II game if it is played "in the same location" as a bingo game. 25 U.S.C. S 2703(7)(A)(i). That Congress would permit this variant of bingo, yielding interim prizes while the main game is ongoing, indicates it did not intend to forbid interim prizes like those CornerMania awards during a game of MegaMania.
 
 
 37
 In light of the foregoing considerations, it is telling that IGRA does not state the game has to end when the first person wins anything. Had Congress intended to proscribe interim prizes, the statute could have been drafted to say that "the game ends" instead of "the game is won," or could have included an express restriction that only one prize be given during the game.[9]
 
 
 38
 The sum of the matter is that the IGRA requirement that a "bingo" game be "won" by the "first player" covering a pre-designatedpattern does not mean the game must end when one player does so, so that everyone else wins nothing. We conclude, therefore, that MegaMania is "won by the first person covering a previously designated arrangement of numbers . . . on [his or her] cards," 25 U.S.C.S 2703(7)(A)(i)(III), within the meaning of IGRA.
 
 C. House Banking Game
 
 39
 IGRA's implementing regulations designate any house banking game as class III gaming. 25 C.F.R. S 502.4(a); see also id. S 502.9 ("Game similar to bingo means any game that meets the requirements for bingo under S 502.3(a) of this part and that is not a house banking game under S 502.11 of this part."). Recall that a house banking game is "any game of chance that is played with the house as a participant in the game, where the house takes on all players , collects from all losers, and pays all winners, and the house can win." 25 C.F.R. S 502.11 (emphases added). The Government reasons that MegaMania fits within this definition because CornerMania's payouts do not hinge on the success of other players but are instead based on a mathematical formula that ensures that over time the house will net fifteen percent of players' antes.
 
 
 40
 In MegaMania, however, the house is not a participant in the game the way it is in blackjack, for example, where the house plays a hand, and the success of the players depends on the success of the house. And the mere fact that the house nets a percentage of the players' fees for playing certainly cannot define a "house banking" game. In any church-hall bingo game, the "house" regularly nets some portion of the money it takes in, or there would be no point in sponsoring the game. Thus, while the house does indeed earn a fixed percentage of players' antes over time, that fact cannot shoehorn MegaMania into the definition of a house banking game set forth in S 502.11. Just because the house turns a profit on players' deposits doesn't make the house "a participant in the game" that "takes on all players" and that "can win".[10]
 
 
 41
 V. "Technologic Aid" or "Electronic Facsimile"
 
 
 42
 Under IGRA, class II gaming includes "the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith)", 25 U.S.C. S 2703(7)(A)(i), but specifically excludes "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." Id. S 2703(7)(A)(ii). The Government claims the MegaMania terminal is an "electronic facsimile", Multimedia, an "electronic, computer, or other technologic aid[ ]".
 
 
 43
 The distinction under IGRA between an electronic "aid" and an electronic "facsimile" is one that has been litigated and decided before. When the issue arose in Spokane Indian Tribe v. United States, the court looked to the Senate Report on IGRA to distinguish between the two. See 972 F.2d 1090, 1093 (9th Cir. 1992). The Senate Report states:[T]ribes should be given the opportunity to take advantage of modern methods of conducting class II games and the language regarding technology is designed to provide maximum flexibility. In this regard, the Committee recognizes that tribes may wish to join with other tribes to coordinate their class II operations and thereby enhance the potential of increasing revenues. For example, linking participant players at various reservations whether in the same or different States, by means of telephone, cable, television or satellite may be a reasonable approach for the tribes to take. Simultaneous games participation between and among reservations can be made practical by use of computers and telecommunications technology as long as the use of such technology does not change the fundamental characteristics of the bingo or lotto games . . . . In other words, such technology would merely broaden the potential participation levels and is readily distinguishable from the use of electronic facsimiles in which a single participant plays a game with or against a machine rather than with or against other players.
 
 
 44
 Senate Report at 9 (emphases added). Relying on the Senate Report, Spokane Indian Tribe noted that an "electronic aid" "enhance[s] the participation of more than one person in . . . Class II gaming activities." 972 F.2d at 1093; see also Sycuan Band of Mission Indians v. Roache, 54 F.3d 535, 542 (9th Cir. 1995) ("[A]n `electronic aid' to a class II game can be viewed as a device that offers some sort of communications technology to permit broader participation in the basic game being played, as when a bingo game is televised to several rooms or locations.") (citing Cabazon Band of Mission Indians v. National Indian Gaming Comm'n, 14 F.3d 633, 637 (D.C. Cir. 1994)). Because the Pick 6 game at issue in the case involved only "a single participant play[ing ] against the machine," the court held that it was an electronic facsimile rather than an electronic aid. 972 F.2d at 1093; see also Sycuan Band, 54 F.3d at 542-43 (concluding that electronic pulltab game in which one player played against machine was exact, self-contained, copy of paper version of game and was thus a class III electronic facsimile thereof); Cabazon Band, 14 F.3d at 636.
 
 
 45
 The MegaMania terminal, in contrast, does "link[ ] participant players at various reservations whether in the same or different States [thereby] broaden[ing ] the potential participation levels." Senate Report at 9; see also Spokane Indian Tribe, 972 F.2d at 1093; Sycuan Band, 54 F.3d at 543. As such, the MegaMania terminal is not a "facsimile of any game of chance," 25 U.S.C. S 2703(7)(A)(ii), or, indeed, a facsimile of anything. Rather, the terminal is merely an electronic aid to human players of bingo, something like electronic mail with a graphic user interface. And, while the government has argued that MegaMania resembles a slot machine in certain limited respects, there has been no argument that the terminal is a "slot machine", id., which it plainly is not. Unlike a slot machine, MegaMania is in truth being played outside the terminal; the terminal merely permits a person to connect to a network of players comprising each MegaMania game, and without a network of at least 12 other players playing at other terminals, an individual terminal is useless. Contrast with Spokane Indian Tribe, 972 F.2d at 1093 ("The player can participate in the game whether or not anyone else is playing at the same time."); Sycuan Band, 54 F.3d at 543; Diamond Game Enterprises, Inc. v. Reno, 9 F. Supp. 2d 13, 20 (D.D.C. 1998) (holding that a certain electronic pull-tab game was a facsimile because it did not permit multiple players to participate at once).
 
 
 46
 The Government urges that in CornerMania players effectively do play against the machine because their winnings do not depend on those of other players. First, in CornerMania players are competing against each other either to be the first to get a corners prize (if the straight-line game has ended), or (if a corners prize hasalready been awarded) to get a corners prize before another player gets straight-line bingo. Second, while the Government's argument could have relevance were CornerMania a free-standing game, one cannot play CornerMania without playing the whole game--MegaMania--and MegaMania requires twelve players to play.
 
 
 47
 In short, the MegaMania terminal is just an electronic aid to bingo, because it "merely broaden[s] the potential participation levels." Senate Report at 9. As such, the MegaMania terminal is class II gaming under IGRA. See 25 U.S.C. S 2703(7)(A)-(B).[11]
 
 VI. The Johnson Act
 
 48
 The Government maintains that the MegaMania terminal, although specifically authorized under IGRA, is nonetheless an illegal "gambling device" under the Johnson Act. The Johnson Act's definition of "gambling device" includes slot machines (statutorily defined in painstaking detail, see 15 U.S.C. S 1171(a)(1)), and also any other "machine or mechanical device" designed "primarily" for gambling that, when operated, either delivers money or property or entitles a player to receive the same "as the result of the application of an element of chance," id. S 1171(a)(1) & (2). The definition also includes "essential part[s] intended to be used in connection with any such machine . . . , but which is not attached." Id. S 1171(a)(3). In most circumstances, the Johnson Act prohibits the possession or operation of any gambling device on federal land and in Indian country. See 15 U.S.C. S 1175. As mentioned, IGRA explicitly repealed the application of the Johnson Act to class III gaming devices used pursuant to tribal-state compacts, see 25 U.S.C. S 2710(d)(6), but did not explicitly address the relationship between IGRA and the Johnson Act as applied to class II gaming.
 
 
 49
 We are not aware of any authority pre-dating IGRA that addresses how the Johnson Act applied to bingo aids. In any event, there is little point at this juncture in engaging in time travel to determine how the Johnson Act would have applied to bingo in Indian country in the absence of IGRA.[12] What matters now is how the two are to be read together--that is, how two enactments by Congress over thirty-five years apart most comfortably coexist, giving each enacting Congress's legislation the greatest continuing effect.
 
 
 50
 The text of IGRA quite explicitly indicates that Congress did not intend to allow the Johnson Act to reach bingo aids. The statute provides that bingo using "electronic,computer, or other technologic aids" is class II gaming, and therefore permitted in Indian country. 25 U.S.C. S 2703(7)(A)(i). Reading the Johnson Act to forbid such aids would render the quoted language a nullity. Why would Congress carefully protect such technologic aids through the text of S 2703(7)(A)(i), yet leave them to the wolves of a Johnson Act forfeiture action? We cannot presume that in enacting IGRA, Congress performed such "a useless act". 2B Norman J. Singer, Sutherland Statutory ConstructionS 49.11, at 83 (5th ed. 1992). By deeming aids to bingo class II gaming in the text of IGRA, see 25 U.S.C. S 2703(7)(A)(i), Congress specifically authorized the use of such aids as long as the class II provisions of IGRA are complied with. See 25 U.S.C. S 2710(a)-(c).
 
 
 51
 In short, while complete, self-contained electronic or mechanical facsimiles of a game of chance, including bingo, may indeed be forbidden by the Johnson Act after the enactment of IGRA, cf. 25 C.F.R. S 502.8 (defining "electronic facsimile" under IGRA as "any gambling device as defined in 15 U.S.C. S 1171(a)(2) or (3) [i.e., the Johnson Act]"); Cabazon Band, 827 F. Supp. at 31 ("[I]t is plainly evident that IGRA's `facsimiles' are the Johnson Act's `gambling devices.' "), we hold that mere technologic aids to bingo, such as the Mega Mania terminal, are not.[13]
 
 
 52
 By so holding, we maintain fidelity to two entrenched canons of statutory construction: (i) courts should give effect to both of two statutes covering related or overlapping subjects, see Boys Markets v. Retail Clerks Union, Local 770, 398 U.S. 235, 249-50 (1970) ("accommodating" the blanket prohibition on federal court strike injunctions in labor disputes contained in S 4 of the Norris-LaGuardia Act, 29 U.S.C.S 104, to the collective bargaining enforcement provision of the laterenacted S 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. S 185(a)), and (ii) a specific statute governs a general one. As the Supreme Court explained in reconciling the long-standing statutory employment preference for Indians in the Bureau of Indian Affairs, see 25 U.S.C. S 461 et seq., with the anti-discrimination provisions of the Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103:
 
 
 53
 . . . [T]he Indian preference statute is a specific provision applying to a very specific situation. The 1972 Act, on the other hand, is of general application. Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.
 
 
 54
 The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. "When there are two acts upon the same subject, the rule is to give effect to both if possible . . . ."
 
 
 55
 Morton v. C.R. Mancari, 417 U.S. 535, 550-51 (1974) (quoting United States v. Borden Co., 308 U.S. 188, 198 (1939)); see also Morales v. Trans World Airlines, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general."); Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445 (1987), superseded on other grounds by the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071. Congress's most recent relevant word on gaming is that aids to bingo are legal in Indian country. Section 2703 of IGRA is a "specific provision applying to a very specific situation," Morton, 417 U.S. at 550,and we must accordingly give it effect here.
 
 
 56
 Finally, our decision carries out Congress's goal-expressed in the text of IGRA--of providing "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. S 2702(1); see also Senate Report at 9 (describing Senate's aim of fostering tribes' use of modern technology in branching their class II gaming operations, thereby "enhanc[ing] the[ir] potential of increasing revenues").
 
 
 57
 MegaMania is class II bingo. Because the MegaMania terminal is a class II aid to bingo, we conclude that it is not an illicit gambling device under the Johnson Act.
 
 CONCLUSION
 
 58
 For the foregoing reasons, Multimedia scores bingo; the judgment is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Cards are randomly generated by computer. (The parties have not explained whether the individual terminals or a central computer outside the terminals generates the cards.) Before the game begins, players may keep their initial card(s), request different cards, or not play them at all. Once the game commences, however, a player cannot change cards but may drop them.
 
 
 [2]
 The numbers in each draw are generated by a machine which, until the Government seized it, was located at the Choctaw gaming facility in Arrowhead, Oklahoma. The machine "blows" approximately forty numbered ping pong balls (out of a pool of seventy-five balls) into a tube. A human operator keys into a computer the number of each ball in the fortynumber sequence. The computer then feeds those numbers into the "game host", which in turn transmits the numbers three at a time to remote host computers at participating gaming facilities. Finally, the remote hosts transmit each three-number sequence to the terminals in their respective facilities.
 
 
 [3]
 To begin playing, a player opens an account with a cashier at a pointof-sale station. The player is then given a specific account number that permits him to track his funds and to log on to a MegaMania terminal. The current balance in the account is displayed at all times on the terminal while the player is in the game. The 25 cent payments are deducted, and any prize money won is added, automatically to the player's account.
 
 
 [4]
 Section 502.3 defines class II gaming in relevant part as:
 (a) Bingo or lotto (whether or not electronic, computer, or other technologic aids are used) when players:
 (1) Play for prizes with cards bearing numbers or other designations;
 (2) Cover numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined; and
 (3) Win the game by being the first person to cover a designated pattern on such cards;
 (b) If played in the same location as bingo or lotto, pull-tabs, punch boards, tip jars, instant bingo, and other games similar to bingo . . . .
 25 C.F.R. S 502.3.
 
 
 [5]
 Neither party contends there is a dispute of fact, material or otherwise.
 
 
 [6]
 [One] commenter suggested that class II gaming be limited to games involving group participation where all players play at the same time against each other for a common prize. In the view of the Commission, Congress enumerated those games that are classified as class II gaming (with the exception of "games similar to bingo"). Adding to the statutory criteria would serve to confuse rather than clarify. Therefore, the Commission rejected this suggestion.
 [Another] commenter questioned whether the definition of bingo in the IGRA limits the presentation of bingo to its classic form. The Commission does not believe Congress intended to limit bingo to its classic form. If it had, it could have spelled out further requirements such as cards having the letters "B" "I" "N" "G" "O" across the top, with numbers 1-15 in the first column, etc. In defining class II to include games similar to bingo, Congress intended to include more than "bingo in its classic form" in that class.
 . . . .
 . . . Congress enumerated the games that fall within class II except for games similar to bingo. For games similar to bingo, the Commission added a definition that includes the three criteria for bingo and, in addition, requires that the game not be a house banking game as defined in the regulations. The Commission believes that Congress did not intend other criteria to be used in classifying games in class II.
 S 502 Action, 57 Fed. Reg. at 12382, 12387.
 
 
 [7]
 The Government concedes that MegaMania satisfies the first two criteria of S 2703(7)(A)(i).
 
 
 [8]
 The Government does not contend that the fact that more than one player can win the straight-line game runs afoul ofS 2703(7)(A)(i)(III).
 
 
 [9]
 We note that there is no indication that the straight-line game is a mere sham supporting CornerMania. The record reveals that CornerMania payouts are generally less than those awarded for achieving a straight-line bingo.
 
 
 [10]
 25 C.F.R. S 502.4, which defines class III gaming under IGRA, refers to keno, a game in which the house does not play a hand, as a house banking game. Shakopee Mdewakanton Sioux Community v. Hope, 16 F.3d 261 (8th Cir. 1994), holds that the NIGC's decision to classify keno as class III gaming is entitled to Chevron deference. See id. at 264 & n.4 (citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)). We do not have in the record a description of keno sufficient to compare it to MegaMania for the purpose of applying to it the criteria of S 502.11. We do know, however, that keno may not have a winner at all, see S 502 Action, 57 Fed. Reg. at 12385; thus the house can win over all players. In contrast, in MegaMania, someone other than the house must win. No NIGC regulation, however, refers to MegaMania as a house banking game. The general criteria of S 502.11 control therefore the question of whether MegaMania is a house banking game, and under those criteria MegaMania clearly is not.
 
 
 [11]
 Because we find that MegaMania is class II gaming under IGRA, we do not reach MegaMania's argument that the Government should be judicially estopped from arguing that MegaMania is an impermissible class III game. Attempting to distinguish the allegedly class III pull-tab game at issue in Diamond Game Enterprises, Inc. v. Reno , 9 F. Supp. 2d 13 (D.D.C. 1998), the Government's briefs in that case unambiguously characterized MegaMania as class II gaming. Multimedia claims that the Government's Janus-faced briefing merits judicial estoppel. Because we find on the merits that MegaMania is class II, we need not decide whether the Government could be estopped in this case from arguing otherwise.
 Likewise, we find it unnecessary to address Multimedia's claim that a series of letters and advisory opinions issued by the NIGC dealing with the class II status of MegaMania provide independent grounds for affirming the district court's grant of summary judgment. For that reason, we deny MegaMania's motion to strike certain portions of the Government's reply brief making what MegaMania asserts are selective, misleading references to one of the NIGC letters.
 
 
 [12]
 We note that at least some members of the Congress that passed IGRA thought the Johnson Act did not apply to bingo aids, for the Senate Report so states. Senate Report at 12; see alsoS 502 Action, 57 Fed. Reg. at 12386 (stating NIGC's conclusion that the Johnson Act does not apply to bingo). Relying on the Senate Report, two courts have determined that the Johnson Act does not apply to bingo aids. See Cabazon Band of Mission Indians v. National Indian Gaming Comm'n, 827 F. Supp. 26, 31 (D.D.C. 1993), aff'd, 14 F.3d 633 (D.C. Cir. 1994); United States v. Burns, 725 F. Supp. 116, 124 (N.D.N.Y. 1989), aff'd sub nom. United States v. Cook, 922 F.2d 1026 (2d Cir. 1991).
 
 
 [13]
 The Government conceded as much at oral argument, asserting that the court should "read the two acts harmoniously; if it's a bingo aid, it's not a Johnson Act gambling device."