F I L E D
United States Court of Appeals
Tenth Circuit

OCT 31 2000

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT
_____

UNITED STATES OF AMERICA,

     Plaintiff-Appellant,

v.

162 MEGAMANIA GAMBLING DEVICES,
sued as: 162 Megamania gambling devices,
more or less, computers, servers, "smart" cards,
and related equipment located at the Cherokee
Nation Bingo Outpost and Cherokee Palace,
Catoosa, Tulsa County, Oklahoma - Cherokee
Nation Bingo Outpost - Cherokee Palace, 83
MEGAMANIA GAMBLING DEVICES, sued
as: 83 Megamania gambling devices, more or
less, computers, servers, "smart" cards, and
related equipment located at the Seneca-
Cayuga Bingo, Grove, Delaware County,
Oklahoma - Seneca-Cayuga Bingo; 40
MEGAMANIA GAMBLING DEVICES, sued
as: 40 MegaMania gambling devices, more or
less, computers, servers, "smart" cards, and
related equipment located at the Cherokee
Nation Bingo Outpost, West Siloam Springs,
Delaware County, Oklahoma - Cherokee Nation
Bingo Outpost; AUTOMATED BINGO
BLOWER MACHINE, sued as: Automated
bingo blower machine, together with computers
and related equipment located at the Choctaw
Indian Bingo (Arrowhead Bingo), Choctaw
Arrowhead Resort, Canadian, Pittsburg County,
Oklahoma - Choctaw Indian

No. 99-5064
(N.D. Okla.)
(D.Ct. No. 97-CV-1140-K(J))

Bingo - Arrowhead Bingo - Choctaw Arrowhead Resort; COMPUTERS, NETWORK SERVERS, MODEMS, SOFTWARE, DATABASES & COMPUTER PROGRAMS, sued as: Computers, Network Servers, Modems, Software, Databases and Computer Programs located at Multimedia Games, Inc., Tulsa, Tulsa County, Oklahoma which are used to support the play of MegaMania gambling devices in Indian Country - Multimedia Games, Inc.; DEPARTMENT OF JUSTICE; JANET RENO, Attorney General of the United States; STEPHEN C. LEWIS, United States Attorney for the Northern District of Oklahoma,

      Defendants,

CHEROKEE NATION OF OKLAHOMA; CHEROKEE NATION ENTERPRISES; MULTIMEDIA GAMES, INC.; THE SENECA-CAYUGA TRIBE OF OKLAHOMA,

      Claimants - Appellees,

----------------------------

STATE OF OKLAHOMA; CHEYENNE GAMING COMMISSION; ARAPAHO GAMING COMMISSION; NATIONAL INDIAN GAMING ASSOCIATION; CHOCTAW NATION OF OKLAHOMA; THE CHICKASAW NATION,

      Amici Curiae.

-2-

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 97-CV-1140-K(J))**

Sean Connelly (Stephen C. Lewis, United States Attorney; Catherine J. Depew, Assistant United States Attorney, Northern District of Oklahoma, Tulsa, Oklahoma, with him on the briefs), United States Department of Justice, Denver, Colorado, for Plaintiff-Appellant.

Tony M. Graham of Feldman, Hall, Franden, Woodard & Farris, Tulsa, Oklahoma, and Jess Green, Seneca Cayuga Tribe of Oklahoma, Ada, Oklahoma (Graydon Dean Luthey, Jr. of Hall, Estill, Hardwick, Gable, Golden & Nelson, Tulsa, Oklahoma, for MultiMedia Games, Inc.; John G. Ghostbear, Tulsa, Oklahoma, for Cherokee Nation of Oklahoma; Layn R. Phillips, Gregory R. Smith, and Theodore H. Frank of Irell & Manella LLP, Los Angeles, California, with them on the brief), for Claimants-Appellees.

Neal Leader, Senior Assistant Attorney General for the State of Oklahoma, Oklahoma City, Oklahoma, on the brief for Amicus Curiae State of Oklahoma; Gary S. Pitchlynn of Pitchlynn, Morse, Ritter & Morse, Norman, Oklahoma, for Amicus Curiae The Cheyenne and Arapaho Gaming Commission; Bob Rabon of Rabon, Wolf & Rabon, Hugo, Oklahoma, and John Tahsuda, General Counsel, National Indian Gaming Association, Washington, D.C., for Amici Curiae National Indian Gaming Association, Choctaw Nation of Oklahoma, and Chickasaw Nation.

Before **BRORBY**, **McKAY**, and **MURPHY**, Circuit Judges.

**BRORBY**, Circuit Judge.

The United States filed a civil complaint in the Northern District of Oklahoma seeking the forfeiture of "MegaMania" machines operated in Indian country. The government asserted the machines operating the game

-3-

"MegaMania" are unlawful gambling devices operated in violation of the Johnson Act, 15 U.S.C. §§ 1171 - 1178.[1] A district judge subsequently issued a warrant to seize the MegaMania machines. The machines are owned by the Cherokee Nation of Oklahoma and the Seneca-Cayuga Tribe of Oklahoma (the Tribes). The Tribes and Multimedia Gambling Devices, Inc. (Multimedia), the manufacturer of the machines, filed claims and answers seeking a declaratory judgment determining the machines are lawful under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 - 2721, and not illegal gambling devices under the Johnson Act.[2] The district court granted summary judgment in favor of Multimedia and the Tribes, ruling the MegaMania machines are utilized for a "Class II" game permitted by the Indian Gaming Regulatory Act and are not illegal gambling devices under the Johnson Act. The district court subsequently denied the government's motion to alter or amend the judgment. The government appeals the decision of the district court. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

I. BACKGROUND

---

[1] The Johnson Act is also known as the Gambling Devices Act. *See Diamond Game Enter., Inc.*, 9 F. Supp. 2d 13, 16 (D. D.C. 1998).

[2] The parties agreed the machines could remain in use on Indian lands pending the resolution of the case.

A.  The Game

At the heart of this dispute is the nature of the game MegaMania.  Thus, we begin our discussion with a description of this game, which the Tribes and Multimedia liken to bingo or a game similar to bingo.  MegaMania is played on a machine called an electronic player station.  These player stations are located on Indian lands in Oklahoma, California, and elsewhere.  A person playing MegaMania begins the game by electronically selecting up to four cards with randomly generated numbers.  The player must pay twenty-five cents per card to begin the game.  A game will commence once at least twelve players nationwide purchase at least forty-eight cards.  A bingo "blower" located in Indian country in Oklahoma selects three numbered balls, and a human operator transmits the numbers on the balls by computer to Multimedia's headquarters where they are sent through a computer network to each player station.  The player then touches the corresponding space or spaces on the player's card appearing on the MegaMania station screen.  To continue playing the game, a player must pay an additional twenty-five cents per card in exchange for the numbers on the next three balls.  These numbers are transmitted in roughly ten second intervals.  Consequently, the player must continue to pay twenty-five cents to one dollar every ten seconds to stay in the game.

With the purchase of these numbers, a MegaMania player simultaneously engages in two aspects of the game, namely "straight-line" bingo and "CornerMania." Straight-line bingo is won by the first player or simultaneous players to cover or "daub" five spaces in a straight line on the player's bingo card image displayed on the screen. Once one or more players cover five spaces in a row on a card, either horizontally, vertically or diagonally, the game terminates unless no player has won at CornerMania. The amount the straight-line winners take depends on a variety of factors: the number of cards played; the number of balls drawn; the amount of money carried over from prior games; and the number of simultaneous straight-line winners.

The object of the CornerMania portion of the game is to cover two, three or four corners of a card and win an interim monetary prize. CornerMania is played until the straight-line bingo is won. If the straight-line bingo ends with no CornerMania winner, additional balls, at three-ball increments, are drawn until at least one CornerMania winner is announced. The amount a player wins at CornerMania is based on a fixed formula that depends solely on the number of corners covered and the number of balls drawn at the time the corners are covered.

On average, Multimedia and the Tribes retain fifteen percent of the amount taken in by the machines and the winning players receive eighty-five percent. In every game of MegaMania, there is at least one straight-line bingo winner and one CornerMania winner.

B. The Statutes

Two pieces of legislation are relevant to this case--the Johnson Act and the Indian Gaming Regulatory Act. Both pertain to gaming activities in Indian country. The Johnson Act makes it unlawful within Indian country to possess or use any "gambling device." 15 U.S.C. § 1175(a). A "gambling device" is defined as any slot machine, 15 U.S.C. § 1171(a)(1), and

> any other machine or mechanical device (including but not limited to, roulette wheels and similar devices) designed and manufactured primarily for use in connection with gambling, and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property.

15 U.S.C. at § 1171(a)(2).

Following the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987) (*Cabazon I*), which authorized gaming on federally recognized Indian lands, Congress enacted the Indian Gaming

Regulatory Act (the Gaming Act), also known as IGRA, codified at 25 U.S.C. §§ 2701 - 2721.[3]  The Gaming Act classifies Indian gaming into three different categories:  Class I, Class II, and Class III.  25 U.S.C. § 2703.  Each of these categories is subject to different degrees of state and federal regulation.  *See Cabazon Band of Mission Indians v. National Indian Gaming Comm'n*, 827 F.Supp. 26, 27 (D. D.C. 1993), *cert. denied*, 512 U.S. 1221 (1994) (*Cabazon II*). The Tribes possess exclusive jurisdiction to regulate Class I gaming, which includes social games and traditional forms of Indian gaming connected to tribal ceremonies.  25 U.S.C. §§ 2703(6), 2710(a)(1).  Class I gaming is not at issue

---

[3]  The purpose of the Gaming Act is:

(1) to provide a statutory basis for the operation of gaming by Indian Tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

25 U.S.C. § 2702.

here.

The Gaming Act defines Class II games to include "the game of chance commonly known as bingo (whether or not electronic, computer or other technologic aids are used in connection therewith) ... including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, *and other games similar to bingo ....*" 25 U.S.C. § 2703(7)(A) (emphasis added). Class II games are regulated by the National Indian Gaming Commission (Commission) and can be operated on Indian lands without a tribal-state compact. *Id.* at §§ 2703(7), 2710(b). All other gaming activity is Class III gaming and is allowed only where a tribal-state compact is entered. *Id.* at §§ 2703(8), 2710(d). The central issues of this case are whether the MegaMania game is properly classified as a Class II or III game, and whether the MegaMania machines are illegal gambling devices under the Johnson Act.

## II. DISCUSSION

We review the grant of a motion for summary judgment *de novo*, applying the same legal standard as the district court. *Sundance Assocs., Inc. v. Reno*, 139 F.3d 804, 807 (10th Cir. 1998). As we have stated on numerous occasions:

> Summary judgment is appropriate if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. If there is no genuine issue of material fact in dispute, then we next determine if the substantive law was correctly applied by the district court.

*Id*. (quotation marks and citations omitted). The facts in this case are not in dispute. The only question in this case is whether the district court correctly analyzed and applied the relevant statutes and regulations. We review the district court's interpretation of federal statutes and regulations *de novo*. *Id.*; *Eastern Inv. Corp. v. United States*, 49 F.3d 651, 657 (10th Cir. 1995).

In conducting our *de novo* interpretation of the statutes at issue, we apply the canons of construction germane to issues arising under Indian law. "The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (quotation marks, citation, and alteration omitted). In issues arising under Indian law, "[s]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Id*. (citing *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 174 (1973)); *Choate v. Trapp*, 224 U.S. 665, 675 (1912).

-10-

In interpreting the Gaming Act, we look to the definitions of the terms and phrases contained therein as set forth by the Commission. Congress created the Commission, 25 U.S.C. § 2704, and gave it authority to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions of [the Gaming Act]." 25 U.S.C. § 2706(b)(10). Thus, we afford the regulations promulgated by the Commission and published in the Code of Federal Regulations the deference prescribed in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). *See also Maier v. United States Envtl. Protection Agency*, 114 F.3d 1032, 1040 (10th Cir.) (stating where Congress explicitly delegates authority to an agency, its legislative regulations are given deference by the courts), *cert. denied*, 522 U.S. 1014 (1997). When reviewing an agency's interpretation of a statute Congress charged it to administer, we ask two questions:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. But if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. If Congress has explicitly or implicitly delegated authority to an agency, legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

*Id*. at 1040 (quoting *Chevron*, 467 U.S. at 842-44) (quotation marks and citations omitted).

We also consider the opinion letters issued by the Commission that interpret the Gaming Act and the interpretations of the Gaming Act set forth by the Commission in the Federal Register. Although we are not obligated to afford these informal pronouncements the same deference prescribed under *Chevron*, such opinion statements are "entitled to respect" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *See Christensen v. Harris County*, 120 S. Ct. 1655, 1662-63 (2000); *Falvo v. Owasso Indep. Sch. Dist. No. I-011*, 220 F.3d 1200, 2000 WL 1472451, at *7 (10th Cir. 2000). Under *Skidmore*, the weight to be afforded non-binding agency interpretations "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140.

A. The Designation of MegaMania as a Class II Game Under the Indian Gaming Regulatory Act

The Gaming Act defines Class II gaming as:

(A)(i) the game of chance *commonly known as bingo* (whether or not electronic, computer, or *other technologic aids* are used in connection therewith) –

   (I) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations,

   (II) in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are

-12-

drawn or electronically determined, and

   (III) in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards, including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, *and other games similar to bingo*,

    ....

  (B) The term "class II gaming" does not include –

  (i) *any banking card games*, including baccarat, chemin de fer, or blackjack (21), or

  (ii) *electronic or electromechanical facsimiles of any game of chance or slot machines of any kind.*

25 U.S.C. § 2703(7) (emphasis added).  Thus, subsections A(i) (I), (II) and (III) set forth three explicit criteria for classification as a Class II game.

In this case, MegaMania meets these three criteria.  Specifically, it is played with an electronic card that looks like a regular paper bingo card containing a grid of numbers, and the first persons to cover a previously designated arrangement of numbers – in this case five straight-line spaces and the necessary corner spaces – wins a monetary prize.  The Ninth Circuit, in addressing the same issues connected with MegaMania, reached the same conclusion in *United States v. 103 Electronic Gaming Devices*, 223 F.3d 1091, 1095 (9th Cir. 2000).

As it did before the Ninth Circuit, the government points to certain variations in the game MegaMania which it asserts make it a Class III game. Specifically, the government argues MegaMania fails to meet the statutory definition of a Class II "bingo" game because: 1) CornerMania is a house banking game, and thus is properly categorized as Class III gaming; 2) the CornerMania game is played concurrently with the straight-line bingo game and includes multiple winners per game; 3) the "ante up" feature fundamentally alters the game to the extent it is no longer a Class II game; 4) the MegaMania machines more closely resemble slot machines than the game commonly known as bingo; and 5) the MegaMania machines are prohibited electromechanical facsimiles of the game of bingo. We are not persuaded by these arguments for the following reasons.

In order to determine whether the game MegaMania is a Class II or III game, we turn for guidance to the definitions relating to Class II games set forth by the Commission as published in the Code of Federal Regulations. In § 502.3(a), the Commission defined Class II gaming as "bingo or lotto (whether or not electronic, computer, or other technological aids are used)" and followed

the definition of bingo described in 25 U.S.C. § 2703(7).[4]  The Commission

defined "[g]ame[s] similar to bingo" as "any game that meets the requirements for

_____

[4]  The Commission's definition of Class II games, which is almost identical to § 2703(7)(A), states:

Class II gaming means:

 (a) Bingo or lotto (whether or not electronic, computer, or other technologic aids are used) when players:
  (1) Play for prizes with cards bearing numbers or other designations;
  (2) Cover numbers or designations when object, similarly numbered or designated, are drawn or electronically determined; and
  (3) Win the game by being the first person to cover a designated pattern on such cards;
 (b) If played in the same location as bingo or lotto, pull-tabs, punch boards, tip jars, instant bingo, and other games similar to bingo;
 (c) Nonbanking card games ....

25 C.F.R. § 502.3.

The Commission also clarified Congress's definition of Class III games as follows:

Class III gaming means all forms of gaming that are not class I gaming or class II gaming, including but not limited to:

 (a) *Any house banking game*, including but not limited to –
 (1) Card games such as baccarat, chemin de fer, blackjack (21), and pai gow (if played as house banking games);
 (2) Casino games such as roulette, craps, and keno;
 (b) *Any slot machines as defined in 15 U.S.C. 1171(a)(1) and electronic or electromechanical facsimiles of any game of chance*;
 (c) Any sports betting and parimutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai; or
 (d) Lotteries.

25 C.F.R. § 502.4 (emphasis added).

-15-

bingo under § 502.3(a) of this part and that is not a house banking game under § 502.11 of this part." 25 C.F.R. § 502.9. The phrase "house banking game" does not appear in the definition of bingo set forth in the Gaming Act. However, Congress specified Class II gaming does not include "(i) any *banking card games*, including baccarat, chemin de fer, or blackjack (21), or (ii) electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." 25 U.S.C. § 2703(7)(B) (emphasis added). The Commission defined a "house banking game" as "any game of chance that is played with the house as a participant in the game, where the house takes on all players, collects from all losers, and pays all winners, and the house can win." 25 C.F.R. § 502.11. In determining whether MegaMania is a Class II game, we note the Gaming Commission expressed its opinion the variations of the game "commonly known as bingo" featured in the MegaMania game are minor, do not alter the fundamental characteristics of the game of bingo, and meet the criteria of the Class II game of bingo or a game "similar to bingo."

1. House Banking Game

The government asserts the availability of jackpot prizes and the

"continuous win"[5] feature of the CornerMania game render MegaMania a Class III house banking game because the house takes fifteen percent of the money paid in and "the house may have to pay out more in winnings than it receives in bets" in a "particular game or series of games." It also contends CornerMania is played against the house and not other players, and violates § 2703(7)(A)(i)(III), which it reads as requiring only one winner. We disagree.

In order to win at either straight-line bingo or CornerMania, the winners must defeat other players, not a machine. The house, in this case the Tribes and Multimedia, is not a "participant" because it does not play a bingo card which players must beat, nor is it ever a "winner" in the game. *See also 103 Electronic Gaming Devices*, 223 F.3d at 1099. As discussed in the next section, CornerMania is clearly an interim part of the game, similar to recognized variations of traditional bingo where more than one prize is allowed for filling in corners. Furthermore, even if the jackpot and CornerMania features make it possible for players to win more than the total amount wagered by all the players, the Commission recognized jackpots are permissible in Class II gaming provided

---

[5] We note the government provides no definition of the term "continuous win." We assume "continuous win" means multiple winners and/or prizes awarded during one game of MegaMania, including CornerMania.

the jackpot, as it does here, remains in place for players to win in future games.[6]

*See* Definitions Under the Indian Gaming Regulatory Act, 57 Fed. Reg. at 12,382, 12,382 (1992). Finally, nothing in the Gaming Act or in the regulation's definition of a "house banking game" prohibits a game where the house may on occasion pay out more than it takes in, or forbids the house from earning a profit. *See* 25 C.F.R. § 502.11; *see also 103 Electronic Gaming Devices*, 223 F.3d at 1099 (explaining "[i]n any church-hall bingo game, the 'house' regularly nets some portion of the money it takes in, or there would be no point in sponsoring the game."). We find the Commission's reasoning persuasive and thus conclude MegaMania is not a "house banking game" as defined by the Code of Federal Regulations. Our holding is reinforced by the following discussion specifically concerning the CornerMania aspect of the game.

### 2. The Interim Win Feature of CornerMania

---

[6] When promulgating the regulations governing the Gaming Act, the Commission addressed this very issue, and concluded bingo games with guaranteed prizes, jackpot prizes or progressive bingo fall within Class II if a player eventually won – *i.e.*, the house never took the jackpot – and a player won a consolation prize in each game. 57 Fed. Reg. at 12,382. Some commenters argued bingo itself is a house banking game. In response to this argument, the Commission concluded "whether a game is a house banking game ... is not relevant to the classification of games that Congress expressly placed in class II: Bingo, lotto, pull-tabs, instant bingo, and tip jars." *Id*. at 12,388. *See Shakopee Mdewakanton Sioux Community v. Hope*, 798 F.Supp. 1399, 1405-06 (D. Minn. 1992).

As part of its argument MegaMania is a "house banking game," the government contends CornerMania converts the game into a Class III game because a player does not have to be the first player to cover the designated pattern of numbers to win at CornerMania. The government points out a player can win at CornerMania at any time before a winner of the straight-line bingo game is identified, and a player can win multiple prizes in CornerMania during one session of MegaMania. Thus, the government contends MegaMania fails to meet the criteria set forth in § 2703(7)(A)(i)(III) that a Class II game "is won by the first person 'covering' the designated arrangement of numbers."[7]

The Commission Chairman addressed these same issues in an opinion letter written to the President of Multimedia, who requested a determination as to whether MegaMania is a Class II game. Regarding CornerMania, the Chairman noted a number of bingo handbooks, manuals and catalogues describe interim win games where a player in a traditional bingo game may win an interim prize by being the first player to cover a predetermined corner pattern of numbers "while

---

[7] In support of its position, the government relies not only on the quoted language, but a section of the Federal Register which states "in Keno there may be many winners or no winners, whereas in bingo there is generally one winner, the first person to call 'bingo.'" *See* 57 Fed. Reg. at 12,385. We nevertheless conclude Class II games are not limited to one winner for the reasons stated.

playing toward a regular predetermined pattern on the bingo card." Accordingly, the Chairman concluded CornerMania "conforms to these pregame prizes which are a part of the game commonly known as bingo."

In addressing the government's argument, the district court correctly pointed out nothing in the Gaming Act or regulations prohibits more than one winner or "interim prizes" during a game of bingo. The Ninth Circuit reached the same conclusion, holding "winning" does not necessarily mean "vanquishing" all other opponents, and identifying Congress' intent to permit interim prizes, given that some traditional variants of bingo allow them. *See 103 Electronic Gaming Devices*, 223 F.3d at 1098-99. Moreover, nothing in the Act or regulations outlines what configuration the predetermined numbers or pattern must be in, i.e., in a straight-line, a corner configuration, or both. *Id.* at 1098. Thus, the language in the Act concerning the "first person" to win is not limited to a straight-line game and should not be read in isolation from the traditional variations of bingo that allow interim prizes and simultaneous winners. For these reasons, we agree with the Chairman, the district court, and the Ninth Circuit in concluding CornerMania does not affect the designation of MegaMania as a Class II game.

3. The "Ante Up" Feature

The government further contends MegaMania is not the game commonly known as bingo or a game "similar to bingo" because instead of paying one up-front price for a bingo card, a MegaMania player must continuously feed money into the machine to receive bingo balls and to continue playing the game. The parties refer to this as the "ante up" feature of the game. The district court determined the ante up feature did not fundamentally alter the game, relying on the following comment made by the Commission during the adoption of the regulations governing the Gaming Act:

F. Players Participating on Equal Basis

One commenter questioned whether the definition of bingo should require that all players participate on an equal basis. The commenter stated that in a traditional bingo game, all cards are purchased for a preset price, notwithstanding limited promotional discounts. The Commission believes that such considerations are marketing decisions and are outside the Act's purview. Therefore, the Commission rejected this suggestion.

57 Fed. Reg. 12,383.

The Acting General Counsel of the Commission also concluded MegaMania is properly categorized as a Class II game not subject to state regulation, stating in an opinion letter to the President of Multimedia:

Finally, a question has been raised about the ante up feature of your game. While I am cognizant of the similarities between such a feature and slot machines, this feature is not essential to the MegaMania game nor does it appear to impact negatively on our

-21-

analysis of the statutory and regulatory criteria for "bingo" or a game "similar to bingo." The feature is essentially similar to the paper card "speed bingo" or "chip up bingo" games played in halls where the player antes up money for each number called. Therefore, while not traditional bingo, the ante up aspect does not change the game so fundamentally that it prevents me from ultimately determining that this is a game similar to bingo.

We begin our discussion on this issue by noting, as did the Ninth Circuit, that nothing in the Gaming Act or the Commission's regulations explicitly or implicitly prohibits the "ante-up" or "pay as you go" system for Class II games. *See 103 Electronic Gaming Devices*, 223 F.3d at 1097. When the Commission commented that the preset price feature in traditional bingo games concerned a marketing decision and was outside the Gaming Act's purview, it implicitly recognized the Act's silence on this matter. While the Commission may or may not have contemplated the "ante-up" scenario before us, its legal counsel directly addressed the matter in the opinion letter. Although succinct, we find this opinion consistent with the Commission's earlier determination that price-setting features for Class II games are beyond the scope of the Act. *See Skidmore*, 323 U.S. at 140. The Commission's counsel's reasoning that the "ante-up" feature does not change the statutory criteria for bingo is sound and supported by the explanation that certain other forms of bingo hall games use "ante-up" features. *Id.* (holding more weight may be given to well-reasoned non-binding agency interpretations.) Given the Act's silence on the pricing system for Class II games,

and our agreement with the Commission's reasoning, we hold the "ante-up" feature does not change MegaMania's Class II status. Any perceived ambiguity concerning the Act's silence on this matter is resolved by applying the canons of construction which require us to construe ambiguous statutes in favor of the Indians. *See Blackfeet Tribe of Indians*, 471 U.S. at 766. If Congress wants to add a pricing or payment requirement to the definition of bingo or games "similar to bingo," it will do so.

### 4. MegaMania's Similarities to a Slot Machine

The government also contends MegaMania more closely resembles a slot machine than the game commonly known as bingo. The government points out the MegaMania machines are designed to resemble slot machines, are faster-paced than traditional or manual bingo, require more investment by the participants than bingo, and cause the individual player to run a greater risk of loss than the average bingo player in a traditional bingo parlor. While the speed, appearance and stakes associated with MegaMania are different from traditional, manual bingo, MegaMania meets all of the statutory criteria of a Class II game, as previously discussed. Moreover, as the Ninth Circuit pointed out, "[u]nlike a slot machine, MegaMania is ... being played outside the terminal; the terminal merely permits a person to connect to a network of players comprising each MegaMania game, and without a network of at least 12 other players playing at other

terminals, an individual terminal is useless." *103 Electronic Gaming Devices*, 223 F.3d at 1100. We therefore reject the government's argument that MegaMania stations are similar to slot machines.

For all the reasons set forth above, we conclude the MegaMania game challenged here meets the statutory criteria for a Class II game in the Gaming Act, 25 U.S.C. § 2703(7)(A)(i). We proceed to analyze whether MegaMania falls within the definition of those games specifically excluded from Class II characterization under 25 U.S.C. § 2703(7)(B) and therefore constitutes an illegal gambling device prohibited by the Johnson Act.

### B. Whether MegaMania is an Electromechanical Facsimile of the Game of Bingo and a Gambling Device Under the Johnson Act

In addition to the criteria for Class II games set forth in § 2703(7)(A)(i) of the Gaming Act, Congress specifically excluded from Class II characterization as games that are house "banking card games" or "electromechanical facsimiles" of such games. 25 U.S.C. § 2703(7)(B).[8] Electromechanical facsimiles are defined in the Code of Federal Regulations as "any gambling device as defined in 15

---

[8] Class III gaming is defined in the Code of Federal Regulations in part as "electronic or electromechanical facsimiles of any game of chance." 25 C.F.R. § 502.4.

U.S.C. §§ 1171(a)(2) or (3) [the Johnson Act]." 25 C.F.R. § 502.8. Thus, the

definition of electromechanical facsimile incorporates the Johnson Act's

definition of a gambling device. A gambling device is defined in the Johnson Act

as:

> any other machine or mechanical device (including, but not limited to, roulette wheels and similar devices) designed and manufactured primarily for use in connection with gambling, and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property.

15 U.S.C. § 1171(a)(2). However, the Gaming Act explicitly permits "electronic,

computer, or other technologic aids" for use in bingo. 25 U.S.C. § 2703(7)(A)(i).

An electronic, computer or other technologic aid is defined in the Code of Federal

Regulations as:

> a device such as a computer, telephone, cable, television, satellite or bingo blower and that when used--
>
> (a) Is not a game of chance but merely assists a player or the playing of a game;
>
> (b) Is readily distinguishable from the playing of a game of chance on an electronic or electromechanical facsimile; and
>
> (c) Is operated according to applicable Federal communications law.

25 C.F.R. § 502.7.

The Tribes and Multimedia contend MegaMania is not an electromechanical

facsimile of the game of bingo, but rather is merely a technological aid to playing bingo, and as such, is properly classified as a Class II game under § 2703(7)(A)(i) of the Gaming Act. Courts reviewing the legislative history of the Gaming Act have recognized an electronic, computer or technological aid must possess at least two characteristics: (1) the "aid" must operate to broaden the participation levels of participants in a common game, *see Spokane Indian Tribe v. United States*, 972 F.2d 1090, 1093 (9th Cir. 1992); and (2) the "aid" is distinguishable from a "facsimile" where a single participant plays with or against a machine rather than with or against other players. *Cabazon Band of Mission Indians v. National Indian Gaming Comm'n*, 14 F.3d 633, 636-37 (D.C. Cir.), *cert. denied*, 512 U.S. 1221 (1994) (*Cabazon III*). Courts have adopted a plain-meaning interpretation of the term "facsimile" and recognized a facsimile of a game is one that replicates the characteristics of the underlying game. *See Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535, 542 (9th Cir. 1994) ("the first dictionary definition of 'facsimile' is 'an exact and detailed copy of something.'" (quoting Webster's Third New Int'l Dictionary 813 (1976)), *cert. denied*, 516 U.S. 912 (1995); *Cabazon II*, 827 F.Supp. at 32 (same); *Cabazon III*, 14 F.3d at 636 (stating "[a]s commonly understood, facsimiles are exact copies, or duplicates.").

In the present case, the district court determined the MegaMania machines

act as aids to the game of bingo rather than unlawful electromechanical facsimiles. We agree. First, the MegaMania machines link up many different players, thus broadening the participation level of the traditional game of bingo. Second, because each player competes against other players to achieve a "bingo" rather than with or against a machine or the "house," the machines are an aid to bingo, rather than a facsimile. We are not persuaded by the government's argument the CornerMania game renders MegaMania an electronic facsimile of the game of bingo because more than one person may win at CornerMania. As discussed above, this is an interim game that is a traditional part of the game of bingo and specifically approved by the Commission. Finally, although MegaMania satisfies the statutory criteria for a Class II game, it cannot fairly be described as an exact copy or replica of the traditional game of bingo, as required to satisfy the plain-meaning definition of "facsimile." We therefore conclude MegaMania is not an electronic facsimile of, but is an aid to, the game of bingo as defined in the Code of Federal Regulations. Accordingly, MegaMania is not excluded from the Gaming Act's definition of a Class II game.

We further conclude Congress did not intend the Johnson Act to apply if the game at issue fits within the definition of a Class II game, and is played with the use of an electronic aid. *See 103 Electronic Gaming Devices*, 223 F.3d at

-27-

1101-02 (holding "[t]he text of [the Gaming Act] quite explicitly indicates that Congress did not intend to allow the Johnson Act to reach bingo aids."); *Cabazon II*, 827 F.Supp. at 31-32 (concluding the Johnson Act does not apply to aids to Class II games, and a narrow interpretation of the Johnson Act's definition of a gambling device is appropriate); *United States v. Burns*, 725 F.Supp. 116, 124 (N.D. N.Y. 1989) (holding "Congress intended that no federal statute should prohibit the use of gambling devices for bingo or lotto, which are legal class II games under the IGRA.  Thus, the IGRA makes 15 U.S.C. § 1175 ... inapplicable to class II bingo and lotto gaming."), *aff'd sub nom.*, *United States v. Cook*, 922 F.2d 1026 (2d Cir.), *cert. denied*, 500 U.S. 941 (1991).[9]  We conclude the Johnson and Gaming Acts are not inconsistent and may be construed together in favor of the Tribes.  *See also 103 Electronic Gaming Devices*, 223 F.3d at 1102 (concluding the Acts must be read together, giving each "the greatest continuing effect.").  For these reasons, we join the Ninth Circuit in concluding MegaMania

---

[9]  The State of Oklahoma, as *amicus curiae*, argues the district court's determination MegaMania is not a gambling device under the Johnson Act creates a dangerous precedent under which "all electronic slot machines and similar devices could be converted into non-gaming devices by simply networking them with a separate computer or device which provided part or all of the element of chance."  Our decision rests on our determination the MegaMania game is bingo or a game "similar to bingo" and the MegaMania machines meet the statutory definition of an "aid to bingo."  Our holding in this case therefore is limited to the MegaMania form of bingo currently at issue.

is not a gambling device as contemplated by either Act, but rather an electronic aid to bingo or a game "similar to bingo."[10]

### C. Judicial Estoppel

The Tribes and Multimedia contend the government should be judicially estopped from claiming MegaMania is anything other than a Class II game. In another case, *Diamond Game Enter., Inc. v. Reno*, 9 F.Supp.2d 13 (D. D.C. 1998), the government used MegaMania as an example of a valid Class II game to support its argument another game, Lucky Tab II, utilized an illegal gambling device under the Johnson Act. The Tribes and Multimedia point to the apparent irony of the government's reliance on *Diamond* in contesting MegaMania's Class II classification in this case.[11]

"Judicial estoppel bars a party from adopting inconsistent positions in the

---

[10] The Ninth Circuit concluded MegaMania is "bingo." *See 103 Electronic Gaming Devices*, 223 F.3d at 1102. Having determined MegaMania is a Class II game, we see no reason to go any further, and leave the specific question whether MegaMania is bingo or a "game similar to bingo" for future resolution.

[11] The Tribes and Multimedia also assert an independent ground for relief claiming their reliance on the government's past advisory opinions and apparent approval of MegaMania as a Class II game should preclude the government from now attacking it. Having ruled on the merits of the claims presented, we decline to address this alternative argument.

same or related litigation." *Rascon v. U. S. West Communications, Inc*., 143 F.3d 1324, 1330 (10th Cir. 1998) (quotation marks and citation omitted).  However, this circuit has expressly rejected the principle of judicial estoppel.  *Webb v. ABF Freight Sys., Inc*., 155 F.3d 1230, 1242 (10th Cir. 1998), *cert. denied*, 526 U.S. 1018 (1999); *United States v. 49.01 Acres of Land*, 802 F.2d 387, 390 (10th Cir. 1986).  Although we recognize this circuit takes a minority viewpoint on this issue, it is well-established a three-judge panel of this court may not overrule circuit precedent.  *United States v. Marquez-Gallegos*, 217 F.3d 1267, 1270 (10th Cir. 2000), *cert. denied*, ___ S. Ct. ___, 2000 WL 1203826 (U.S. July 31, 2000) (No. 00-5447).  "The proper avenue for raising this issue lies in a petition for en banc review."  *Id*. (quotation marks, alterations and citation omitted).

## III.  CONCLUSION

For the reasons set forth above, we conclude the MegaMania game challenged here is a Class II game under the Indian Gaming Regulatory Act, and its machines are not illegal gambling devices operated in violation of the Johnson Act.  We **AFFIRM** the district court's grant of summary judgment in favor of the Tribes and Multimedia.