T.C. Memo. 2004-275

UNITED STATES TAX COURT

RONALD F. AND CYNTHIA G. VAN SCOTEN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24946-96.            Filed December 6, 2004.

<u>Wendy S. Pearson</u>, <u>Terri A. Merriam</u>, and <u>Jennifer A. Gellner</u>,
for petitioners.

<u>Nhi T. Luu-Sanders</u> and <u>Alan E. Staines</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GOLDBERG, <u>Special Trial Judge</u>:  Respondent determined that
petitioners are liable for a section 6662(a) accuracy-related
penalty of $2,872 for the taxable year 1991.  Unless otherwise
indicated, section references are to the Internal Revenue Code in

effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The sole issue before this Court is whether petitioners are liable for the section 6662(a) accuracy-related penalty for negligence or disregard of rules or regulations in the year in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first, second, third, and fourth stipulations of facts and the attached exhibits are incorporated herein by this reference. Petitioners resided in Sandy, Utah, on the date the petition was filed in this case.

I. Walter J. Hoyt III and the Hoyt Partnerships

The accuracy-related penalty at issue in this case arises from adjustments of partnership items on petitioners' 1991 Federal income tax return. The adjustments are the result of petitioners' involvement in a partnership organized and promoted by Walter J. Hoyt III (Mr. Hoyt).

Mr. Hoyt's father was a prominent breeder of Shorthorn cattle, one of the three major breeds of cattle in the United States. In order to expand his business and attract investors, Mr. Hoyt's father had started organizing and promoting cattle breeding partnerships by the late 1960s. Before and after his father's death in early 1972, Mr. Hoyt and other members of the

Hoyt family were extensively involved in organizing and operating numerous cattle breeding partnerships. From about 1971 through 1998, Mr. Hoyt organized, promoted to thousands of investors, and operated as a general partner more than 100 cattle breeding partnerships. Mr. Hoyt also organized and operated sheep breeding partnerships in essentially the same fashion as the cattle breeding partnerships (collectively the investor partnerships or Hoyt partnerships). Each of the investor partnerships was marketed and promoted in the same manner.

Beginning in 1983, and until removed by this Court due to a criminal conviction, Mr. Hoyt was the tax matters partner of each of the investor partnerships that are subject to the provisions of the Tax Equity & Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324. As the general partner managing each partnership, Mr. Hoyt was responsible for and directed the preparation of the tax returns of each partnership, and he typically signed and filed each return. Mr. Hoyt also operated tax return preparation companies, variously called "Tax Office of W.J. Hoyt Sons", "Agri-Tax", and "Laguna Tax Service", that prepared most of the investors' individual tax returns during the years of their investments. Petitioners' 1991 return was prepared in this manner and was signed by Mr. Hoyt. From approximately 1980 through 1997, Mr. Hoyt was a licensed enrolled agent, and as such he represented many of the investor-partners

before the Internal Revenue Service (IRS) until he was disenrolled as an enrolled agent in 1998.

Beginning in February 1993, respondent generally froze and stopped issuing income tax refunds to partners in the investor partnerships. The IRS issued prefiling notices to the investor-partners advising them that, starting with the 1992 taxable year, the IRS would disallow the tax benefits that the partners claimed on their individual returns from the investor partnerships, and the IRS would not issue any tax refunds these partners might claim attributable to such partnership tax benefits.

Also beginning in 1993, an increasing number of investor-partners were becoming disgruntled with Mr. Hoyt and the Hoyt organization. Many partners stopped making their partnership payments and withdrew from their partnerships, due in part to respondent's tax enforcement. Mr. Hoyt urged the partners to support and remain loyal to the organization in challenging the IRS's actions. The Hoyt organization warned that partners who stopped making their partnership payments and withdrew from their partnerships would be reported to the IRS as having substantial debt relief income, and that they would have to deal with the IRS on their own.

On June 5, 1997, a bankruptcy court entered an order for relief, in effect finding that W.J. Hoyt Sons Management Company and W.J. Hoyt Sons MLP were both bankrupt. In these bankruptcy

cases, the U.S. trustee moved in 1997 to have the bankruptcy court substantively consolidate all assets and liabilities of almost all Hoyt organization entities and all of the investor partnerships. On November 13, 1998, the bankruptcy court entered its Judgment for Substantive Consolidation, consolidating all the above-mentioned entities for bankruptcy purposes. The trustee then sold off what livestock the Hoyt organization owned or managed on behalf of the investor partnerships.

Mr. Hoyt and others were indicted for certain Federal crimes and a trial was conducted in the U.S. District Court for the District of Oregon. The District Court described Mr. Hoyt's actions as "the most egregious white collar crime committed in the history of the State of Oregon." Mr. Hoyt was found guilty on all counts, and as part of his sentence in the criminal case he was required to pay restitution in the amount of $102 million. This amount represented the total amount that the United States determined, using Hoyt organization records, was paid to the Hoyt organization from 1982 through 1998 by investor-partners in various investor partnerships.

II. Petitioners and Their Investment

Petitioner husband (Mr. Van Scoten) has an associate's degree, and petitioner wife (Ms. Van Scoten) completed 1 year of a college education. During the year in issue, Mr. Van Scoten

worked as an equipment salesman, and Ms. Van Scoten was a respiratory therapist.[1]

Mr. Van Scoten's father, Edward Van Scoten, has a bachelor's degree. He served in the Air Force for approximately 21 years, after which time he taught at a community college and worked for an electronics corporation. He also had limited experience with dairy farms--he spent his childhood living on or near dairy farms, and as a teenager and for 1 year, amidst his Air Force career, he worked on a dairy farm.

Edward Van Scoten invested in a Hoyt partnership in December 1983. He first learned about the Hoyt organization from his nephew, who had already invested in a Hoyt partnership. In making his own investment, Edward Van Scoten relied upon information obtained from his nephew and from the Hoyt organization. He did not seek outside advice, such as advice from an attorney or accountant. After making his investment, Edward Van Scoten spent one summer working on a Hoyt ranch, where he drove a truck hauling hay bales. He also attended monthly Hoyt partner meetings over a period of several years starting in the early 1990s.

Petitioners first learned of the Hoyt partnership investments from Mr. Van Scoten's father in 1988. Mr. Van Scoten knew that his father "had been in it for quite a number of years,

_____

[1]On the 1990 and 1991 Federal income tax returns signed by Ms. Van Scoten, both state that she was a receptionist.

didn't appear to have a problem with or any issues about it, so my wife and I had talked about it and about two years later we decided that we would invest."  During the time between 1988 and petitioners' investment in early 1991, Mr. Van Scoten spoke to his father about the Hoyt partnerships on a regular basis.  His father told him that

> the partnership involved cattle; in particular, what he called "Borrow-A-Bull."  That entailed investing money into the partnership, buying what I presumed was a percentage of a group of cattle, and from there, after a number of years or after the initial investment, then we would receive a return on our investment.

Mr. Van Scoten's father also told him that he had seen cattle and "numerous trucks with the Walter J. Hoyt logo and insignia" on them.  Mr. Van Scoten trusted his father's advice to invest in a Hoyt partnership because his father had attended partnership meetings and had seen Hoyt cattle and trucks.[2]  When giving his son advice concerning the investment, Edward Van Scoten relied partially on the information he had received from the Hoyt organization, and also answered "yes" to his son's inquiry "does this makes sense".

Petitioners first invested in a Hoyt partnership in January 1991.[3]  At the time that petitioners invested in the partnership,

_____

[2]While the record is clear that Ms. Van Scoten was an investor in the Hoyt partnership, because she did not testify at trial there is no evidence in the record with respect to her understanding of the investment or her decision to invest.

[3]Although Mr. Van Scoten testified at trial that "I believe
(continued...)

Mr. Van Scoten had no investment experience. Although Mr. Van Scoten had lived on a family farm for approximately 2 years, neither petitioner had experience in cattle ranching. Because he trusted his father's advice, Mr. Van Scoten did not personally investigate the partnership. While Mr. Van Scoten relied on his father's advice concerning the Hoyt investment, he did not review his father's partnership documents, and he was unaware in which partnership his father had invested.

At the time that petitioners initially made their investment, Mr. Van Scoten believed that the investment would produce a profit and provide retirement income. Mr. Van Scoten understood that the investment generally required petitioners to remit 75 percent of the Federal income tax refunds that they received and that petitioners were to retain the remaining 25 percent. Before investing in the Hoyt partnerships, petitioners did not consult with anyone other than members of the Hoyt organization and investors in Hoyt partnerships--for example, they did not consult with cattle ranchers, independent investment consultants, or independent tax advisers--concerning either the partnerships or the tax claims made by the partnerships.

Prior to investing, petitioners received promotional materials prepared by the Hoyt organization. Petitioners relied

---

[3](...continued)
the first year we invested" was 1990, the documentary evidence shows that the investment was in fact made in January 1991.

on these promotional materials which, in general, purported to provide rationales for why the partnerships were good investments and why the purported tax savings were legitimate. One document on which petitioners relied, entitled "Hoyt and Sons -- The 1,000 lb. Tax Shelter", provided information concerning the Hoyt investment partnerships and how they purportedly would provide profits to investors over time. The document emphasized that the primary return on an investment in a Hoyt partnership would be from tax savings, but that the U.S. Congress had enacted the tax laws to encourage investment in partnerships such as those promoted by Mr. Hoyt. The document stated that an "investment in cattle [is arranged] so the cash required to keep it going is only about seventy five percent" of an investor's tax savings, while the other twenty-five percent of the tax savings is "a thirty percent return on investment." This arrangement purportedly provided protection to investors: "If the cows do die and the sky falls in, you have still made a return on the investment, and no matter what happens you are always better off than if you paid taxes." After an explanation of the tax benefits, the document asked: "Now, can you feel good about not paying taxes, and feeling like you were not, somehow, abusing the system, or doing something illegal?"

A section of the "1,000 lb. Tax Shelter" document that was devoted to a discussion of audits by the IRS, stated that the partnerships would be "branded an 'abuse' by the Internal Revenue

Service and will be subject to automatic" and "constant audit".
Statements in the document compared the IRS to children, stating that IRS employees did not have the "proper experience and training" and "working knowledge of concepts required by the Internal Revenue Code" to evaluate the partnerships. In a section of the document titled "Tax Aspects", the following "warning" was given:

> Out here, tax accountants don't read brands, and our cowboys don't read tax law. If you don't have a tax man who knows you well enough to give you <u>specific personal advice as to whether or not you belong in the cattle business</u>, <u>stay out</u>. The cattle business today cannot be separated from tax law any more than cattle can be separated from grass and water. Don't have anything to do with any aspect of the cattle business without thorough tax advice, <u>and don't waste much time trying to learn tax law from an Offering Circular</u>.

Despite this warning, the document spent numerous pages explaining the tax benefits of investing in a Hoyt partnership, and explaining why investors should trust only Mr. Hoyt's organization to prepare their individual tax returns:

> It is the recommendation of the General Partner, as outlined in the private placement offering circular, that a prospective Partner seek independent advice and counsel concerning this investment. * * * The Limited Partners should then authorize the Tax Office of W.J. Hoyt Sons to prepare their personal returns. * * * Then you have an affiliate of the Partnership preparing all personal and Partnership returns and controlling all audit activity with the Internal Revenue Service. * * * Then, all Partners are able to benefit from the concept of "Circle the Wagons," and no individual Partner can be isolated and have his tax losses disallowed because of the incompetence or lack of knowledge of a tax preparer who is not familiar with the law, regulations, format, procedures, and operations concerning the Partnership that are required to protect the Limited Partners from Internal Revenue audits. * * * If a Partner needs more or less Partnership loss any year, it is

> arranged quickly within the office, without the Partner having to pay a higher fee while an outside preparer spends more time to make the arrangements.

Finally, the document warned that there remained a chance that "A change in tax law or an audit and disallowance by the IRS could take away all or part of the tax benefits, plus the possibility of having to pay back the tax savings, with penalties and interest."

Prior to petitioners' investment in the partnership, Mr. Van Scoten also received from the Hoyt organization a copy of this Court's opinion in Bales v. Commissioner, T.C. Memo. 1989-568. Mr. Hoyt touted the Bales opinion as proof that the Hoyt partnerships were legal, and that the IRS was incorrect in challenging their tax claims. Mr. Van Scoten believed that the Bales opinion meant "basically, that a partnership either similar to ours or like it was--it had gone to court and the Bales had won the case. As far as the details about it, I don't know."

On January 7, 1991, petitioners signed a document comprised of four sections in order to invest in the Hoyt partnership known as Durham Shorthorn Breed Syndicate 1987-C (DSBS 87-C). The first section was titled "Subscription Agreement -- Durham Shorthorn Breed Syndicate 1987-C J.V. -- Series 'A' Units". This section expressed petitioners' intent to make a capital contribution to and become a limited partner of DSBS 87-C with respect to certain "Series 'A' Units". Included in this section was a "Power of Attorney" form, which provided in relevant part:

The UNDERSIGNED hereby constitutes and appoints Walter J. Hoyt III his/her true and lawful attorney with power and authority to act in the UNDERSIGNEDS' behalf in the execution, acknowledging, and filing of the documents as follows:

1.   The Partnership Certificates for filing, and

2.   Any document which may be required to effect the restructuring, amending, or continuation of the Partnership, the admission of any substituted or added Partner, or the dissolution and termination of the Partnership, provided such restructuring, continuation, admission or dissolution and termination are in accordance with the terms of the Partnership Agreement, and

3.   Any and all documents required to be executed by a substituted, substituting or added Partner, to effectuate the transfer of a Partner's interest in the Partnership, and

4.   Any other instrument, application, certificate, or affidavit which may be required to be filed by the Partnership under the laws of any State or any Federal, or local agency or authority, and

5.   Any promissory notes, bills-of-sale or other instruments required for the conduct of the Partnership business, including an assumption of primary liability form attached to promissory notes for which the UNDERSIGNED becomes personally liable for operating deficits of the Partnership up to a maximum of Five Thousand Dollars ($5,000.00) per SERIES "A" UNIT if needed to meet the business goals of the partnership.

The second section of the document was a "Partnership Agreement", purportedly affirming certain "oral Partnership Agreements that were made on or about" January 7, 1991. The third section was titled "Subscription Agreement -- Durham Shorthorn Breed Syndicate 1987-C J.V. -- Series 'B' Units", and was similar to the first section, without a power of attorney form. The fourth section was titled "Subscription Agreement -- Durham Shorthorn Breed Syndicate 1987-C J.V. -- Series 'C' Units". This section

was similar to the first section, and it included a "Debt Assumption" provision "to memorialize, affirm and set out the oral Debt Assumption Agreement" along with another power of attorney form with similar provisions as those detailed above. Paragraph 5 of the power of attorney form, which differed from the prior form, provided Mr. Hoyt with the authority to execute:

> 5.  Any promissory notes, bills-of-sale or other instruments required for the conduct of the Partnership business, including a certificate of assumption of primary liability form attached to promissory notes and held by the lender for which the UNDERSIGNED becomes personally liable directly to the lender for recourse debt of the Partnership in order to pay his initial capital contribution to the partnership.

On July 31, 1991, Mr. Van Scoten signed a document titled "Subscription Agreement and Signature Page for Limited Partners". This document contained provisions similar to those in the prior document, and it included another power of attorney form. The document purported to evidence a financial institution's purchase of four "units" of the partnership Hoyt & Sons Ranch Properties, Ltd., at a cost of $2,000, to be held in trust for the benefit of Mr. Van Scoten. When Mr. Van Scoten signed the various partnership documents and power of attorney forms, he believed that petitioners would be required to repay the promissory notes signed on their behalf by Mr. Hoyt.

Petitioners made substantial cash payments to the Hoyt organization during the years 1991 through 1997. In a summary of such payments prepared by petitioners, they estimate that the

total amount of these payments exceeds $40,000. These payments included the remittance of their tax refunds, the payment of quarterly and monthly installments on their promissory notes, special "assessments" imposed by the partnership, and contributions to purported individual retirement account plans maintained by the Hoyt organization. Petitioners continued contributing to the partnership even after they stopped receiving refunds from respondent. During and after the year in issue, petitioners received numerous documents purporting to show both the legitimacy of the Hoyt partnerships and the legality of the tax claims being made by the Hoyt organization. The Hoyt organization also portrayed employees of the IRS as incompetent and claimed that they were engaging in unjust harassment of Hoyt investors. Petitioners trusted these documents and believed and relied upon what the Hoyt organization told them.

III. Petitioners' Federal Tax Claims

On June 10, 1991, petitioners filed a joint Federal income tax return for 1990, on which they reported the following:

| | |
|---|---:|
| Wage income | $46,162 |
| Interest income | 29 |
| Pension and annuity income | 8,422 |
| Loss from DSBS 87-C | (148,390) |
| IRA contribution | (2,000) |
| Adjusted gross income | (95,777) |
| Tax liability | 842 |
| Overpayment | 3,771 |

Upon filing their 1990 return, petitioners also filed a Form 1045, Application for Tentative Refund. On this form,

petitioners claimed a net operating loss (NOL) carryback from 1990 in the amount of $102,228.  Petitioners reported the following after application of the carryback to the respective taxable years:

|                        | 1987     | 1988     | 1989     |
|------------------------|----------|----------|----------|
| AGI on return          | $49,726  | $38,967  | $40,889  |
| Tax liability on return| 5,949    | 3,529    | 3,549    |
| Corrected tax liability| -0-      | -0-      | -0-      |
| Overpayment            | 5,949    | 3,529    | 3,549    |

The 1990 return and the Form 1045 were prepared by individuals affiliated with the Hoyt organization.  The refund and tentative refunds requested by petitioners with respect to the 1990 return and the carryback years totaled $16,798.  Petitioners remitted two payments to the Hoyt organization during 1991 in the form of two cashier's checks dated May 8, 1991, and August 20, 1991, in the respective amounts of $7,000 and $9,750.

In January 1992, prior to the time petitioners signed their 1991 return, respondent mailed Hoyt investors, including petitioners, a letter regarding the application of section 469 (relating to passive activity loss limitations).  That same month, Mr. Hoyt mailed a letter to investors, including petitioners, setting forth arguments that Hoyt investors materially participated in their investments within the meaning of section 469.  In this letter, Mr. Hoyt stated that respondent's assertions in the preceding letter were incorrect, and that the investors should do what was necessary to

participate in their investment at least 100 or 500 hours per year, depending upon the circumstances, in order to meet the section 469 requirements. Mr. Hoyt stated that the time investors spent in recruiting new investors, as well as "reading and thinking about these letters", would count toward the material participation hourly requirements. Finally, in this letter Mr. Hoyt emphasized that "The position of your partnership is that it is not a tax shelter", because tax shelters "are never recognized for Federal income tax purposes." By letter dated February 11, 1992, respondent mailed petitioners a notice stating:

> In Mr. Hoyt's letter misleading and/or inaccurate premises were made which may directly affect you and your decision-making process in filing your 1991 individual tax return.
> First, a "tax shelter" is not necessarily synonymous with a "sham" investment. Low income housing credits, your personal residence, and real estate rentals are examples of tax shelters. It is an oversimplification to state tax shelters are never recognized for Federal income tax purposes.
> The letter stated that I failed to include number seven of the regulations which addresses the facts and circumstances test. Enclosed is the exact wording of this test, Regulation 1.469-5T(a)(7), and example #8 which refers to this regulation. Also enclosed is paragraph (b) that is referred to in paragraph (a)(7). Section 1402 noted in paragraph (b) defines income subject to self-employment tax. In the past, and currently, Mr. Hoyt has used Revenue Rulings 56-496, 57-58, and 64-32 as authorities for investors having met the material participation requirement. These rulings and the court cases he has cited are prior to the enactment of section 469 and all refer to section 1402. Please note in (b)(2) that meeting the material participation requirement of Section 1402 is specifically excluded from being taken into account for having met the material participation requirement of section 469 in using the facts and circumstances test of (a)(7).

Whether a person meets the material participation requirement of section 469 is a factual determination. The Reg. 1.469-5T(f)(2)(ii) defines investors' activities that are not considered in meeting the hourly requirement. Simply signing a statement or making an election are not a means in meeting the requirement. Although Section 469 may not have existed at the time of your initial investment, it is law that investors have to address in claiming investment losses today. Contrary to Mr. Hoyt's statement, time spent reading and thinking about this issue should not be considered as material participation hours for 1992.

If this letter is somewhat confusing or you are questioning the accuracy of this letter, I recommend you consider having an independent accountant or attorney review this matter with you.

In addition to the above correspondence, petitioners received a letter dated February 3, 1992 that informed them that respondent was beginning an examination of DSBS 87-C with respect to its taxable year ending in 1990. When petitioners received any correspondence from respondent, petitioners would mail or fax copies to the Hoyt organization, but they would take no further action, and they sought no advice concerning the information that they were receiving from respondent.

Petitioners filed a joint Federal income tax return for taxable year 1991, the year in issue, reporting the following:

| | |
|---|---|
| Wage income | $51,362 |
| Interest income | 71 |
| State tax refunds | 1,433 |
| Loss from DSBS 87-C | (45,510) |
| Farm income | 22,199 |
| IRA contribution | (2,000) |
| Self-employment tax deduction | (240) |
| Adjusted gross income | 27,315 |
| Tax liability | 1,798 |
| Overpayment | 2,471 |

The Schedule K-1, Partner's Share of Income, Credits, Deductions, Etc., attached to petitioners' return indicates that the DSBS 87-C loss comprised of a "nonpassive activity deduction" of $18,810, and a "special allocation deduction" of $26,700. The Schedule K-1 also lists farm income of $22,199 as nonemployee compensation earned by petitioners, and the schedule lists this amount as a contribution to the partnership. A statement attached to the return indicates that petitioners "contributed $2,000.00 in cash to the partnership as part of his [sic] total cash contribution" and that petitioners "should claim $2,000.00 as an I.R.A. contribution for 1991" if they qualify. Another statement, separately signed by petitioners, indicates that petitioners materially participated in partnership-related activities--on the blank line following "The numbers [sic] of hours we spent working in our business activity in 1991 was", petitioners filled in "all that was needed to be done." The 1991 return was prepared by one of Mr. Hoyt's tax preparation services and was signed by Mr. Hoyt. Mr. Hoyt signed the return on April 10, 1992, and petitioners signed the return on April 14, 1992.

Petitioners remitted two payments to the Hoyt organization during 1992, one in the form of a cashier's check dated June 15, 1992, in the amount of $3,000, and a second payment in December 1992 in the amount of $1,250.

Upon signing the returns and forms prepared by the Hoyt organization, Mr. Van Scoten did not know how the Hoyt-related

items were derived; he knew only that Mr. Hoyt or a member of his organization had entered the items on the returns, and he assumed the items were therefore correct.  Mr. Van Scoten did not question any of the amounts shown on the return, and petitioners did not have the returns reviewed by an accountant or anyone else outside the Hoyt organization prior to signing them.

Respondent issued a Notice of Final Partnership Administrative Adjustment (FPAA) to petitioners with respect to DSBS 87-C that reflected the disallowance of various deductions claimed on the partnership return for its taxable year ending in 1991.  Because a timely petition to this Court was not filed in response to the FPAA issued for DSBS 87-C, respondent made a computational adjustment assessment against petitioners with respect to the FPAA.  The computational adjustments changed petitioners' claimed DSBS 87-C loss of $45,510 to income of $4,998, disallowed the partnership-related IRA contribution deduction of $2,000, and made computational adjustments to petitioners' itemized deductions and self-employment tax deduction based on the above two changes.[4]  These changes increased petitioners' tax liability to $16,479, an increase of $14,681 above petitioners' reported tax liability of $1,798.  In the notice of deficiency underlying this case, respondent

_____

[4]The amount of the farm income reported by petitioners on their 1991 return was not changed by respondent pursuant to the computational adjustment assessment, presumably because the farm income was not a partnership item.

determined that petitioners are liable for the section 6662(a)
accuracy-related penalty for negligence or disregard of rules or
regulations with respect to $14,359 of the underpayment resulting
from the DSBS 87-C computational adjustment.

OPINION

## I. Evidentiary Issues

As a preliminary matter, we address evidentiary issues
raised by the parties in the stipulations of facts.  The parties
reserved objections to a number of the exhibits and paragraphs
contained in the stipulations, all on the grounds of relevancy.
Federal Rule of Evidence 402[5] provides the general rule that all
relevant evidence is admissible, while evidence which is not
relevant is not admissible.  Federal Rule of Evidence 401
provides that "'Relevant evidence' means evidence having any
tendency to make the existence of any fact that is of consequence
to the determination of the action more probable or less probable
than it would be without the evidence."  While certain of the
exhibits and stipulated facts are given little to no weight in
our finding of ultimate facts in this case, we hold that the
exhibits and stipulated facts meet the threshold definition of
"relevant evidence" under Federal Rule of Evidence 401, and that
the exhibits and stipulated facts therefore are admissible under
Federal Rule of Evidence 402.  Accordingly, to the extent that

---

[5]The Federal Rules of Evidence are applicable in this Court
pursuant to sec. 7453 and Rule 143(a).

the Court did not overrule the relevancy objections at trial, we do so here.

## II. The Section 6662(a) Accuracy-Related Penalty

Section 6662(a) imposes an addition to tax of 20 percent on the portion of an underpayment attributable to any one of various factors, one of which is "negligence or disregard of rules or regulations". Sec. 6662(a) and (b). "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and "disregard of rules or regulations" includes any careless, reckless, or intentional disregard. Sec. 6662(c). The regulations under section 6662 provide that negligence is strongly indicated where: A taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be "too good to be true" under the circumstances * * * . Sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

Negligence is defined as the "'lack of due care or failure to do what a reasonable or ordinarily prudent person would do under the circumstances.'" Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part on another ground 43 T.C. 168 (1964)); see Anderson v. Commissioner, 62 F.3d 1266, 1271 (10th Cir. 1995), affg. T.C. Memo. 1993-607. Negligence is determined by testing a taxpayer's conduct against

that of a reasonable, prudent person.  Anderson v. Commissioner,
supra at 1272-1273.  Courts generally look both to the underlying
investment and to the taxpayer's position taken on the return in
evaluating whether a taxpayer was negligent.  Id.; Keeler v.
Commissioner, 243 F.3d 1212, 1221 (10th Cir. 2001), affg. Leema
Enters., Inc. v. Commissioner, T.C. Memo. 1999-18; Sacks v.
Commissioner, 82 F.3d 918, 920 (9th Cir. 1996), affg. T.C. Memo.
1994-217.  When an investment has such obviously suspect tax
claims as to put a reasonable taxpayer under a duty of inquiry, a
good faith investigation of the underlying viability, financial
structure, and economics of the investment is required.  Roberson
v. Commissioner, T.C. Memo. 1996-335, affd. without published
opinion 142 F.3d 435 (6th Cir. 1998) (citing LaVerne v.
Commissioner, 94 T.C. 637, 652-653 (1990), affd. without
published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401
(10th Cir. 1991), affd. without published opinion 956 F.2d 274
(9th Cir. 1992); Horn v. Commissioner, 90 T.C. 908, 942 (1988)).

The Commissioner's decision to impose the negligence penalty
is presumptively correct.[6]  Rule 142(a); Anderson v.
Commissioner, supra at 1271.  A taxpayer has the burden of
proving that respondent's determination is erroneous and that he

---

[6]While sec. 7491 shifts the burden of production and/or
burden of proof to the Commissioner in certain circumstances,
this section is not applicable in this case because respondent's
examination of petitioners' return did not commence after July
22, 1998.  See Internal Revenue Service Restructuring and Reform
Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.

did what a reasonably prudent person would have done under the circumstances. Bixby v. Commissioner, 58 T.C. 757, 791 (1972).

III. Application of the Negligence Standard

Although petitioners had no background in cattle ranching, and petitioners did not consult any independent investment advisers, petitioners made the decision to invest in a cattle ranching activity as a means to provide for their retirement. As part of their initial investment in the Hoyt partnerships, petitioners provided Mr. Hoyt with the authority to sign promissory notes on their behalf. The power of attorney forms which petitioners signed granted Mr. Hoyt the authority to incur personal debts on petitioners' behalf, debt that Mr. Van Scoten believed petitioners would be required to repay in the event something went wrong with the partnership. In addition to the promissory notes, the power of attorney forms granted Mr. Hoyt the power to control numerous aspects of petitioners' investment without prior consultation with petitioners. Nevertheless, petitioners placed their trust entirely with the Hoyt organization, and they did not investigate the legitimacy of the partnerships with anyone not employed by or invested in the Hoyt organization. We conclude that petitioners were negligent in signing the power of attorney forms and in entering into the investment. Furthermore, we note that we do not accept Mr. Van Scoten's testimony that he did not intend to invest in a tax shelter, and that he "never intended not to pay" his taxes. The

promotional materials received by petitioners specifically called the Hoyt investment a "tax shelter" and specifically stated that the primary return on any investment would be from tax savings.

In the years preceding their investment, 1987 through 1989, petitioners reported adjusted gross income (AGI) averaging approximately $43,000 each year. In each of these years, petitioners paid Federal income taxes in an amount averaging approximately $4,300. After making their investment in DSBS 87-C in January 1991, petitioners filed a 1990 return on which they claimed a deduction for a partnership loss of $148,390, reducing their 1990 tax liability on $46,162 of wage income to only $842. Petitioners then filed the Form 1045 on which they used the partnership loss to reduce their tax liability to zero in each of 1987, 1988, and 1989. Finally, for the year in issue, 1991, petitioners claimed an additional partnership loss deduction of $45,510, resulting in a tax liability of $1,798. While this loss was partially offset by the farm income reported on the return, petitioners' tax liability was nevertheless less than half of petitioners' average tax liability before application of the carryback in the years prior to their investment.

Petitioners claimed the tax benefits from the partnership losses based solely on the advice that they received from the promoters of the investment and from other Hoyt investors. Furthermore, the promotional materials that petitioners received had clearly indicated that there were substantial tax risks in

making an investment. Nevertheless, petitioners did not investigate the tax claims being made by the Hoyt organization with anyone who was not involved with the organization.

When it came time to prepare petitioners' tax returns and claim the losses being reported by the Hoyt partnerships, petitioners relied on the very people who were receiving the bulk of the tax savings generated by the claims. Thus, the same individuals who sold petitioners an interest in the Hoyt partnerships and who ran the purported ranching operations also prepared the partnerships' tax returns, prepared petitioners' tax returns, and received from petitioners most of the tax savings that resulted from the positions taken on petitioners' returns. When petitioners filed their 1991 return, Mr. Van Scoten did not know, and there is no evidence that Ms. Van Scoten knew, how the loss or other amounts were derived; he knew only that the Hoyt organization had reported the amounts on petitioners' tax return. Petitioners claimed the loss despite the fact that respondent had warned petitioners, as well Mr. Van Scoten's father, that there were potential problems with the tax claims being made on both the partnership returns and on petitioners' returns. Prior to signing their 1991 return, petitioners had received at least two separate letters from respondent alerting petitioners to suspected problems or alerting petitioners to reviews that had been commenced with respect to their partnership. Despite these letters, petitioners did not further investigate the partnership

losses, such as by consulting an independent tax adviser, before claiming the losses as deductions on their 1991 return. Instead, petitioners essentially ignored the letters, merely sending copies of them to the Hoyt organization as petitioners had been instructed to do.

Finally, petitioners' actions with respect to the 1991 return reflect a nonchalant attitude with respect thereto, rather than a reasonable attempt to ascertain their proper tax liability. For example, on the statement attached to petitioners' return regarding material participation, petitioners merely stated that they worked "all that was needed to be done", rather than specifying an accurate number of hours. When questioned at trial concerning a partnership-related item appearing on the return, Mr. Van Scoten testified twice that he "probably looked at it and did not pay any attention to" the amount appearing on the return. Petitioner further testified that, in reviewing the 1991 return, "like most naive people, I'd look for the smiley face at the end, not the numbers that got to it."

Upon the basis of the record before the Court, we conclude that petitioners were negligent in 1991 in deducting the $45,510 partnership loss from DSBS 87-C.

IV. Alleged Defenses to the Accuracy-Related Penalty

Section 6664(c)(1) provides that the section 6662(a) accuracy-related penalty is not imposed "with respect to any

portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664-4(b)(1), Income Tax Regs. The extent of the taxpayer's effort to ascertain his proper tax liability is generally the most important factor. Id.

A. Reliance on the Hoyt Organization and Edward Van Scoten

Petitioners first argue that they should escape the negligence penalty because they relied in good faith on various individuals with respect to the Hoyt investment: Mr. Hoyt and other members of the Hoyt organization, tax professionals hired by the Hoyt organization, and Mr. Van Scoten's father, Edward Van Scoten.

Good faith reliance on professional advice concerning tax laws may be a defense to the negligence penalties. United States v. Boyle, 469 U.S. 241, 250-251 (1985); see also sec. 1.6664-4(b)(1), Income Tax Regs. However, "Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered". Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). In order to be considered as such, the reliance must be reasonable. Id. To be objectively reasonable, the advice generally must be from competent and

independent parties unburdened with an inherent conflict of interest, not from the promoters of the investment. Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994), affg. T.C. Memo. 1993-480; LaVerne v. Commissioner, 94 T.C. at 652); Rybak v. Commissioner, 91 T.C. 524, 565 (1988); Edwards v. Commissioner, T.C. Memo. 2002-169.

It is clear in this case that petitioners' reliance on the Hoyt organization to prepare their tax returns was not objectively reasonable. We note that petitioners did not receive any specific advice concerning the deduction of the partnership loss--they simply accepted whatever numbers were placed on the return by the Hoyt organization and signed the returns as they were presented to them. Petitioners' reliance on the Hoyt organization to prepare the returns was not objectively reasonable because Mr. Hoyt and his organization created and promoted the partnership, they completed petitioners' tax return, and they received the bulk of the tax benefits from doing so. For petitioners to trust Mr. Hoyt or members of his organization to prepare their return under these circumstances was inherently unreasonable.

In addition to members of the Hoyt organization itself, petitioners argue that they relied on tax professionals hired by the Hoyt organization. Petitioners, however, have only established that they believed that the Hoyt organization had consulted with tax professionals. Petitioners have not

established in what manner they personally relied upon any such professionals, or even the details of what advice the professionals provided that would be applicable to petitioners' situation with respect to the year in issue. Furthermore, because all of these individuals were affiliated with the Hoyt organization, it would have been objectively unreasonable for petitioners to rely upon them in claiming the tax benefits advertised by that very organization.

We reach a similar conclusion with respect to petitioners' reliance on Mr. Van Scoten's father, Edward Van Scoten. While Mr. Van Scoten trusted Edward Van Scoten because of their relationship, Edward Van Scoten lacked the expertise necessary to provide objectively reasonable advice concerning an investment in a Hoyt partnership. Although he had experience working on dairy farms, this experience was not directly transferable to a purportedly vast cattle ranching operation with a complex financial and ownership structure. Furthermore, Edward Van Scoten's information pertaining to the tax benefits of an investment in the Hoyt organization was derived from the same source as Mr. Van Scoten's information--from the promotional materials and newsletters issued by the Hoyt organization. Ultimately, petitioners' reliance on Mr. Van Scoten's father for advice concerning the Hoyt partnership investment does not absolve petitioner from the negligence penalty.

B.  Deception and Fraud by Mr. Hoyt

Petitioners next argue that they should not be liable for the negligence penalty because they were defrauded and otherwise deceived by Mr. Hoyt with respect to their investment in the Hoyt partnerships.  In this regard, petitioners first argue that the doctrine of judicial estoppel bars application of the negligence penalty because the U.S. Government successfully prosecuted Mr. Hoyt for, in general terms, defrauding petitioners.

Judicial estoppel is a doctrine that prevents parties in subsequent judicial proceedings from asserting positions contradictory to those they previously have affirmatively persuaded a court to accept.  United States ex rel. Am. Bank v. C.I.T. Constr., Inc., 944 F.2d 253, 258-259 (5th Cir. 1991); Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598-599 (6th Cir. 1982).  While this Court has accepted the doctrine of judicial estoppel, see Huddleston v. Commissioner, 100 T.C. 17, 28-29 (1993), the Court of Appeals for the Tenth Circuit, to which appeal lies in this case, has expressly rejected the doctrine. United States v. 162 MegaMania Gambling Devices, 231 F.3d 713, 726 (10th Cir. 2000).  Consequently, the doctrine of judicial estoppel is not applicable in this case.  See Golsen v. Commissioner, 54 T.C. 742, 757 (1970) (holding that this Court must "follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone").

Despite the inapplicability of the judicial estoppel doctrine in this case, we note that respondent's position herein is in no manner contradictory to the position taken by the United States in the criminal conviction of Mr. Hoyt. See, e.g., Goldman v. Commissioner, 39 F.3d at 408 (taxpayer-appellants' argument that an investment partnership "constituted a fraud on the IRS, as found by a civil jury * * * and by the tax court * * * cannot justify appellants' own failure to exercise reasonable care in claiming the losses derived from their investment"). To the contrary, this Court has sustained a finding of negligence with respect to investors who had been victims of deception by tax shelter promoters. For example, in Klieger v. Commissioner, T.C. Memo. 1992-734, this Court held that taxpayers in a situation similar to that of petitioners were negligent. In Klieger, we addressed taxpayers' involvement in certain investments that were sham transactions that lacked economic substance:

> Petitioners are taxpayers of modest means who were euchred by Graham, a typical shifty promoter. Graham sold petitioners worthless investments by giving spurious tax advice that induced them to reduce their withholding and turn their excess pay over to Graham as initial payments to acquire interests in "investment programs" that did not produce any economic return and apparently never had any prospects of doing so. Graham purported to fulfill his prophecies about the tax treatment of the Programs by preparing petitioners' tax returns and claiming deductions and credits that have been disallowed in full, with resulting deficiencies * * *.

                    * * * * * * *

When a tax shelter is a sham devoid of economic substance and a taxpayer relies solely on the tax shelter promoter to prepare his income tax return or advise him how to prepare the return with respect to the items attributable to the shelter that the promoter has sold him, it will be difficult for the taxpayer to carry his burden of proving that he acted reasonably or prudently. Although a tax shelter participant, as a taxpayer, has a duty to use reasonable care in reporting his tax liability, the promoter who prepares the participant's tax return can be expected to report large tax deductions and credits to show a relatively low amount of tax due, and thereby fulfill the prophecies incorporated in his sales pitch. * * *

In a vein similar to their judicial estoppel argument, petitioners further argue that Mr. Hoyt's deception resulted in an "honest mistake of fact" by petitioners when they entered into their investment. More specifically, petitioners assert that they had insufficient information concerning the losses and that "all tangible evidence available to the Hoyt partners supported Jay Hoyt's statements."

Reasonable cause and good faith under section 6664(c)(1) may be indicated where there is "an honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Sec. 1.6664-4(b)(1), Income Tax Regs. However, "reasonable cause and good faith is not necessarily indicated by reliance on facts that, unknown to the taxpayer, are incorrect." Id.

For the reasons discussed above in applying the negligence standard, whether or not petitioners had a "mistake of fact" does not alter our conclusion that petitioners' actions in relation to

their investment and the tax claims were objectively unreasonable. Furthermore, and again for the reasons discussed above, petitioners' failure to investigate further--beyond what was made available to them by Mr. Hoyt and his organization--was also not an objectively reasonable course of action.

C. Petitioners' Investigation

Petitioners further argue that they had reasonable cause for the underpayment because they made a reasonable investigation into the partnership, taking into account the level of their sophistication. Petitioners assert that this investigation yielded no indication of wrongdoing by Mr. Hoyt, and petitioners further assert that an average taxpayer would have been unable to uncover Mr. Hoyt's fraud. As we have held, petitioners' investigation into the partnership went no further than members of the Hoyt organization and Mr. Van Scoten's father, who was another Hoyt investor and who in turn was relying on the Hoyt organization. Relying on these individuals as a source of objective information concerning the partnerships was not reasonable. Furthermore, petitioners were negligent in not further investigating the partnership and/or seeking independent advice concerning it.

D.  The Bales Opinion

Petitioners next argue that they had reasonable cause for the underpayment because of this Court's opinion in Bales v. Commissioner, T.C. Memo. 1989-568.[7]  Bales involved deficiencies asserted against various investors in several different cattle partnerships marketed by Mr. Hoyt.  This Court found in favor of the investors on several issues, stating that "the transaction in issue should be respected for Federal income tax purposes."  The Bales case involved different investors, different partnerships, different taxable years, and different issues than those underlying the present case.

First, petitioners argue they relied on Bales in claiming the deduction for the partnership loss.  We find that petitioners have not established that they relied on Bales in this manner. While petitioners received the opinion, there is no evidence that they, without any background in law or accounting, personally relied upon the opinion in claiming the relevant partnership loss.  To the contrary, Mr. Van Scoten testified at trial that he

---

[7]Petitioners also argue that the Bales opinion provided "substantial authority for the positions taken on petitioners' 1991 income tax return."  There is no explicit "substantial authority" exception to the sec. 6662(a) accuracy-related penalty for negligence.  Hillman v. Commissioner, T.C. Memo. 1999-255 n.14 (citing Wheeler v. Commissioner, T.C. Memo. 1999-56).  While petitioners refer to the "reasonable basis" exception to the negligence penalty, set forth in sec. 1.6662-3(b)(3), Income Tax Regs., they do not specifically argue that the exception applies in this case.  Nevertheless, we note that the record does not establish that petitioners had a reasonable basis for claiming the partnership loss at issue in this case.

did not know any details concerning the opinion, and, when questioned about a letter from the Hoyt organization regarding another case in this Court, he further testified that he "didn't care about" the portions of the letter pertaining to the "Tax Court writing stuff". In short, the record shows that if petitioners relied on Bales to any degree, they relied only on the interpretation of Bales provided by Mr. Hoyt and members of his organization, who repeatedly claimed that Bales was proof that the partnerships and the tax positions were legitimate. We have already found that petitioners' reliance on Mr. Hoyt and his organization was objectively unreasonable and, as such, not a defense to the negligence penalty. Accepting Mr. Hoyt's assurances that Bales was a wholesale affirmation of his partnerships and his tax claims was no less unreasonable.

Second, petitioners argue that, because this Court was unable to uncover the fraud or deception by Mr. Hoyt in Bales, petitioners as individual taxpayers were in no position to evaluate the legitimacy of their partnership or the tax benefits claimed with respect thereto. This argument employs the Bales case as a red herring: Bales involved different investors, different partnerships, different taxable years, and different issues. Furthermore, adopting petitioners' position would imply that taxpayers should have been given carte blanche to invest in partnerships promoted by Mr. Hoyt, merely because Mr. Hoyt had previously engaged in activities which withstood one type of

challenge by the Commissioner, no matter how illegitimate the partnerships had become or how unreasonable the taxpayers were in making investments therein and claiming the tax benefits that Mr. Hoyt promised would ensue.

E.  Fairness Considerations

Petitioners' final arguments concerning application of the accuracy-related penalty are in essence arguments that imposition of the penalty would be unfair or unjust in this case. Petitioners argue that "The application of penalties in the present case does not comport with the underlying purpose of penalties."  To this effect, petitioners argue that, in this case,

> The problem was not Petitioners' disregard of the tax laws, but was Jay Hoyt's fraud and deception.  Petitioners did not engage in noncompliant behavior, instead [they] were the victims of a complex fraud that it took Respondent years to completely unravel.

> Petitioner Ron Van Scoten made a good faith effort to comply with the tax laws and punishing him by imposing penalties does not encourage voluntary compliance, but instead has the opposite effect of the appearance of unfairness by punishing the [victim].

We are mindful of the fact that petitioners were victims of Mr. Hoyt's fraudulent actions.  Petitioners ultimately lost the bulk of the tax savings that they received, which they had remitted to Mr. Hoyt as part of their investment.  Nevertheless, petitioners believed that this money was being used for their own personal benefit--at the time that they claimed the tax savings, they believed that they would eventually benefit from them.  Mr.

Hoyt's conduct does not alter our conclusion that petitioners were negligent with respect to entering the Hoyt investment, and that they were negligent with respect to the position that they took on their 1991 tax return. Despite Mr. Hoyt's actions, the positions taken on the 1991 return signed by petitioners were ultimately the positions of petitioners, not of Mr. Hoyt.

V. Conclusion

Upon the basis of the record before the Court, we conclude that petitioners' actions in relation to the Hoyt investment constituted a lack of due care and a failure to do what reasonable or ordinarily prudent persons would do under the circumstances. First, petitioners entered into an investment, in which they gave Mr. Hoyt authority to incur personal debts on their behalf and control petitioners' interest in their partnership, without investigating the legitimacy of the partnerships beyond the advice of Mr. Van Scoten's father. Second, and foremost, petitioners trusted individuals who told them that they effectively could escape paying Federal income taxes for a number of years--petitioners reported a combined tax liability of $2,640 on $106,046 of wage, interest, and pension income over 2 years, and reported zero tax liability on $129,582 of AGI for the prior 3 years--based solely upon the tax advice of the individuals promoting the tax shelter. Our conclusion is reinforced by the fact that petitioners received warnings from respondent, warnings that petitioners chose to ignore. We find

that petitioners were negligent with respect to entering the Hoyt investment, and that they were negligent with respect to claiming the DSBS 87-C loss on their return.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.